## THE RUPERT CITY.

(District Court, W. D. Washington, N. D. April 14, 1914.)

No. 2487.

1. MARITIME LIENS (§ 56*) — SUITS TO ESTABLISH — STATUS AND RIGHTS OF MORTGAGEE.

A mortgage on a vessel is not a maritime lien, but is always subordinate to such liens. It is not even a maritime contract, and cannot be foreclosed in a suit in rem, but the mortgagee may intervene in such a suit and defend against the establishment of maritime liens against the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 95; Dec. Dig. § 56.*]

2. MARITIME LIENS (§ 69*) — SUITS TO ENFORCE — DISTRIBUTION OF SURPLUS FUND.

When a vessel has been sold in a suit to establish maritime liens, after the payment of such liens the court will direct the payment from the fund of such nonmaritime liens as have been proved, but cannot pay claims not supported by liens.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 107; Dec. Dig. § 69.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MARITIME LIENS (§ 39*)—ASSIGNMENT—ENFORCEMENT BY ASSIGNEE.

A claim entitled to a maritime lien may be assigned, and the lien enforced by the assignee in his own name.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 57; Dec. Dig. § 39.*]

4. ASSIGNMENTS (§ 121*)—ASSIGNMENT FOR COLLECTION—RIGHT OF ASSIGNEE TO SUE IN HIS OWN NAME.

An assignment of a claim for collection is an assignment for value, and vests such an interest in the assignee as entitles him to sue thereon in his own name.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 200–205; Dec. Dig. § 121.*]

5. MARITIME LIENS (§ 1*)—DEFINITION.

A "maritime lien" may be defined as a right of property in a ship adhering to it wherever it may go, vesting a right in the person whose claim is thereby secured to cause a sale of the ship in a proceeding directly against it in order to obtain satisfaction of his debt.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 5, pp. 4377, 4378.]

6. MARITIME LIENS (§ 26*)—CONTRACTS GIVING LIENS.

A contract to give rise to a maritime lien must be a maritime contract, and there must be a pledge of the ship for the performance of such contract either express, by implication from the circumstances, or arising therefrom by operation of law.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 39; Dec. Dig. § 26.*]

7. MARITIME LIENS (§ 9*) — MARITIME SERVICES — LOADING OR DISCHARGING SHIP.

The loading or discharging of a cargo is a maritime service which will support a maritime lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 13; Dec. Dig. § 9.*]

8. MARITIME LIENS (§ 25*) — FURNISHING "NECESSARIES" — CONTRACT FOR STEVEDORING.

A stevedore contracting with the managing owner for the discharge of a ship furnishes "necessaries" within the meaning of Act June 23, 1910, c. 373, §§ 1, 2, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), and is entitled to a maritime lien thereunder.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–36; Dec. Dig. § 25.*

For other definitions, see Words and Phrases, vol. 5, pp. 4693–4703.]

9. MARITIME LIENS (§ 12*)—EXTENT OF LIEN—INCIDENTAL EXPENSES.

A maritime lien for furnishing supplies or other necessaries to a ship includes expenses incidental thereto, such as the cost of delivering the supplies to the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 16; Dec. Dig. § 12.*]

10. SEAMEN (§ 27*)—WAGES OF MASTER—LIEN—BRITISH AND CANADIAN STATUTES.

While by the general maritime law a master is not entitled to a lien for wages, under the Canadian Shipping Act, § 194, and the British Merchants' Shipping Act of 1894, § 167, both of which give a master the same right as a seaman to a lien for wages, the master of a British ship, registered in a Canadian port, who contracted with the owner, a resident of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Canada, is entitled to a lien for his wages although an American, and employed in a port of the United States.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 4, 141, 157–169; Dec. Dig. § 27.*]

11. SHIPPING (§ 69*)—MASTER—TERMINATION OF EMPLOYMENT—SEIZURE OF VESSEL.

The wages of the master of a ship terminated when she was taken into custody in proceedings to enforce liens against her.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 201, 293–307, 312, 313, 315, 317, 318; Dec. Dig. § 69.*]

12. MARITIME LIENS (§ 14*)—ADVANCES BY MASTER.

The power of the master to hypothecate his vessel depends upon necessity, and he can claim a lien for advances only where they were made to discharge or prevent the incurring of a lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 18; Dec. Dig. § 14.*]

13. MARITIME LIENS (§ 14*)—DISBURSEMENTS BY MASTER—SHORE EXPENSES.

A master is not entitled to a maritime lien on the ship for his personal expenses on shore, although incurred in connection with the owner's business.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 18; Dec. Dig. § 14.*]

14. MARITIME LIENS (§ 9*)—SUBJECT-MATTER OF CLAIM—BROKERAGE CHARGES.

Claims against a ship for brokerage charges for aiding in the entry of the ship in customhouse, etc., are not secured by a maritime lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 13; Dec. Dig. § 9.*]

15. MARITIME LIENS (§ 12*)—SUPPLIES FURNISHED CREW AFTER SEIZURE OF VESSEL.

One furnishing provisions and lodging to the crew of a ship on shore after she has been seized in legal proceedings is not entitled to a maritime lien therefor.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 16; Dec. Dig. § 12.*]

In Admiralty. Suit by Fischer Bros. against the steamship Rupert City; Watts, Watts & Co., mortgagee, claimant. On exceptions to report of commissioner as to liens. Sustained in part, and overruled in part.

George R. Biddle, of Seattle, Wash., for libelants.

Huffer & Hayden, of Tacoma, Wash., for claimant.

Herr, Bayley & Wilson, of Seattle, Wash., for intervener Williams et al.

Albert Moodie, of Seattle, Wash., for intervener Wireless Telegraph Co.

Daniel Landon, of Seattle, Wash., for the crew.

NETERER, District Judge. On the 23d day of January, 1913, the Rupert City, owned and operated by a corporation of British Columbia, flying the British flag, sailed from Seattle bound for Australia. On May 28, 1913, she arrived on her return voyage and anchored at Port Townsend. On the same day a libel was filed by Fischer Bros., monition issued, and the vessel taken into the custody of the United States marshal. Thereafter various intervening libels were filed by the members of the crew for wages, by the master for wages and ad-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

vances, and by various parties claiming to have furnished supplies, repairs, or other necessaries. On the 19th day of June, 1913, Watts, Watts & Co. filed a petition in intervention alleging that it was the owner and holder of a certain mortgage executed to secure the payment of $19,000 advanced and other sums to become due, and prayed that it might appear and claim the vessel and defend against the various libels filed therein. Leave was accordingly granted by order of court on June 19, 1913. The cause was referred to the United States commissioner, who took the testimony and reported findings of fact and conclusions of law, and the cause is now before the court on exceptions to the report of the commissioner.

[1] Interveners Watts, Watts & Co. claim priority of their mortgage over the various lien claimants. It is, however, well settled that a mortgage is not and cannot be made a maritime lien and that it is always subordinate to such liens. The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345; Schuchardt v. Babbage, 19 How. 239, 15 L. Ed. 625; The Lyndhurst (D. C.) 48 Fed. 839. It is not even a maritime contract and may not be foreclosed in an action at rem. Bogart v. The John Jay, 17 How. 399, 15 L. Ed. 95; Rea v. The Eclipse, 135 U. S. 599, 608, 10 Sup. Ct. 873, 34 L. Ed. 269.

It does not follow, as contended, however, that the mortgagee may not intervene and defend against the establishment of maritime liens against the vessel. These would deplete the fund upon which he must rely, as the vessel when sold is discharged of his lien, and the mortgagee has a claim only upon the proceeds of the sale. Schuchardt v. Babbage, 19 How. 239, 15 L. Ed. 625; The H. N. Emilie (D. C.) 70 Fed. 511; The Advance (D. C.) 63 Fed. 704; The Old Concord, Fed. Cas. No. 10,482; The Mary Anne, Fed. Cas. No. 9,195.

[2] When the vessel is sold and the fund is in the registry of the court, after the payment of all maritime claims, the court will order the payment of such nonmaritime liens as have been established, in the order of their priority. Claims not supported by liens cannot be paid out of the fund, since they are against the owners personally, and not against the fund. The Advance (D. C.) 63 Fed. 704, 706.

[3] Libelants Fischer Bros. seek to establish not only a lien for supplies furnished by them, but also liens for supplies, repairs, and other necessaries furnished by various parties whose claims were assigned to the libelants by instruments in writing. It is stipulated that such claims were assigned for the purpose of "collection" and that Fischer Bros. "did not pay cash for them." Intervening mortgagee contends that a maritime lien is personal and that a maritime claim cannot be assigned so as to vest the lien in the assignee and entitle him to enforce it in his own name. But the great weight of authority is against such contention. 26 Cyc. 801, and cases there cited; The Sarah J. Weed, Fed. Cas. No. 12,350; The Emma L. Coyne, Fed. Cas. No. 4,-466.

[4] Exception is taken to the finding of the commissioner that the assignments were for value, and the contention is made that nothing having been paid, the assignor is the real party in interest and the assignee cannot maintain the action. But an assignment for collection in writing should be held to vest such an interest in the assignee

as to entitle him to sue. The Court of Appeals of New York, in Hays v. Hathorn, 74 N. Y. 486, holds that an assignment for collection is an assignment for value, and that the assignee may sue, although the Code of that state provides that actions shall be brought in the name of the "real party in interest." To the same effect is the holding of the Supreme Court of Washington. McDaniel v. Pressler, 3 Wash. 636, 29 Pac. 209.

[5, 6] As the right of the various creditors to be paid out of the fund depends upon whether they have maritime liens, it may be well to call attention to the nature and character of maritime liens on ships and the circumstances which give rise to them. A maritime lien may be defined as a right of property in a ship adhering to it wherever it may go, vesting a right in the person whose claim is thereby secured to cause a sale of the ship in a proceeding directly against it in order to obtain satisfaction of his debt. It may arise from tort or contract. A contract to give rise to such a lien must be a maritime contract; that is, one which relates to the use of the ship as an instrument of commerce and navigation and one which tends to aid it in the accomplishment of its adventures as such. It is also necessary that the ship be pledged for the performance of such a contract before a lien will arise. Such pledging may be expressed in the agreement of the parties, or it may be implied from the circumstances under which they contracted that such was their intention, or the law may say from the nature of the contract and the circumstances under which it was made that a lien shall arise to secure its performance. The first question, therefore, to be determined, is whether the particular contract relied upon as creating the claim was a maritime contract, and, if so, did the parties expressly or impliedly contract that the credit of the ship might be relied upon for its enforcement, or was such an incident attached to the contract by the law?

## The Fischer Claims.

[7] The commissioner allowed Fischer Bros., as assignee, $627.25 for services performed in discharging the cargo at San Francisco. It is stipulated with respect to this claim that O. J. Humphrey, the managing owner of the Rupert City, was at San Francisco when the work was done, and that it was performed at his special instance and request. It is now settled that the labor of loading or discharging a cargo is a maritime service for which the credit of the ship may be so pledged as to give rise to an action in rem, since it is necessary to enable the ship to fulfill her maritime obligations. The Seguranca (D. C.) 58 Fed. 908; The Mattie May (D. C.) 45 Fed. 899; Florez v. The Scotia (D. C.) 35 Fed. 916; The George T. Kemp, Fed. Cas. No. 5,341, 2 Low. 477. It is stated that, where the stevedore is directly employed, his labor being similar to that which was formerly performed by seamen, he has a lien by the general maritime law, irrespective of whether or not the work was done in the home port of the vessel. But where the work of loading or discharging a cargo is done by a contractor who furnishes the labor of others, it is then stated that his claim is similar to that of one who furnishes workmen for repairs, and that, when done in the home port of the vessel,

the presumption is that he intended to rely upon the credit of the owners. The Seguranca, supra.

[8] The basic principle of a lien for necessaries is that the vessel must go on, and where its needs cannot be supplied from funds furnished by the owners or upon their personal credit the master is vested with power to pledge the credit of the ship. Where such necessaries are furnished in the home port of the vessel, there is no presumption of necessity to pledge the credit of the ship, and this is also true where the contract is made with the owners or in their presence, even though the vessel may not be in the home port. 19 Am. & Eng. Encyc. of Law, 1102; The General Smith, 4 Wheat. 438, 4 L. Ed. 609; 19 Am. & Eng. Enc. of Law, 1098; 26 Cyc. 778; The Havana, 92 Fed. 1107, 35 C. C. A. 148. Quite generally the states enacted laws which provided for liens when the necessaries were furnished at the home port of the vessel, and the effect of these statutes is not to create a lien against the intention of the parties, but to create a presumption that such was their intention where nothing appears to the contrary. 26 Cyc. 777; The Westover (D. C.) 76 Fed. 381; The Golden Rod, 151 Fed. 8, 80 C. C. A. 248.

The Act of June 23, 1910, c. 373, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), provides:

"Section 1. That any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"Sec. 2. That the following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted."

In Ely v. Murray, 200 Fed. 369, 118 C. C. A. 520, it was held that this statute met the presumption that necessaries furnished on the order of the owner were upon his personal credit, and thus that it is analogous to the state statutes, the effect of which is to give rise to a presumption that the parties intended to contract in reference to the credit of the ship. In the recent case of The Sinaloa (D. C.) 209 Fed. 287, Judge Dooling held that this statute did not give a lien for the services of a watchman employed by the owner of a launch. This holding, however, is based expressly upon the fact that the services of the watchman were not maritime in character. The court says:

"This act does not by any fair construction of its terms include the services here in suit, nor is it clear that its terms should be so extended by construction as to include them. The apparent intent of the act was to relieve those persons who formerly would have had a lien if credit had been given to the vessel from the necessity of alleging and proving that credit had been so given. The purpose does not seem to have been to create a new class of liens, or liens for services which had been theretofore determined not to be maritime, but only to deal with certain matters that had always been recognized as cognizable."

In The J. Doherty (D. C.) 207 Fed. 997, Judge Veeder held that the statute in question was not intended to apply to towage. The learned judge concluded that the act was intended to raise the pre-

sumption of a lien only where there was no lien given by the maritime law. A lien for towage, even on the owner's order, being presumed by the maritime law where the services were performed in an exigency or under circumstances of necessity, he said the act had no application. The court also applied the rule of ejusdem generis, and held that "other necessaries," when used in connection with "repairs" and "supplies," must be construed to mean necessaries of like nature, and not whatever was necessary to facilitate the use of the ship.

If the stevedores in this case had themselves contracted with the managing owner, treating their services as analogous to those of seamen, by the general maritime law they would have a lien on the vessel.

"There are maritime services which are usually rendered under circumstances which make them so essential to the movement of a vessel, and to the performance of her primary function as an instrument of commerce, that the admiralty law presumes they are rendered on the credit of the vessel, in the absence of proof to the contrary, and creates a maritime lien in their favor, independently of the question whether it be a domestic vessel, or not. Notable examples are the lien for pilotage services, the lien for seamen's wages, for towage services, and for salvage services." The Alligator, 161 Fed. 37, 88 C. C. A. 201.

But where the contract is made with the owner by one who furnishes stevedores, as in this case, he cannot claim wages, for he has rendered no personal service, and he cannot claim to be subrogated to the liens of the stevedores, for they have agreed to look to him and not to the vessel for pay. He therefore is in the same position as one who furnishes supplies or repairs. Speaking of such contractors, Judge Brown, in The Seguranca (D. C.) 58 Fed. 908, 910, says:

"They simply supplied the labor of other persons, whom they employed and paid. This differs in no degree, so far as I can perceive, from a contractor's supply of workmen to do repairs; and thus the present case falls strictly within the analogy of repairs and supplies in the home port."

It is evident, therefore, if we construe the statute as intending to raise the presumption of a lien only where the maritime law does not create one, that the act does apply to the furnishing of stevedores by a contractor in the home port or on the order of the owner, for by the general maritime law no lien arises from such a contract. Still further, if we apply the rule of ejusdem generis, the furnishing of stevedores under such a contract is similar to that of a contractor's furnishing of workmen to do repairs, so that it would come strictly within the phrase "other necessaries," even though such term be limited to necessaries of a nature similar to those mentioned. I must therefore conclude that, when the contract was made by the California Stevedore & Ballast Company with the managing owner of the vessel, a presumption arose according to the provisions of the Act of June 23, 1910, that the credit of the ship was pledged thereby, and this presumption is not rebutted by any facts or circumstances appearing in the testimony.

The same principles govern the assigned claim of the Washington Stevedore Company. It was named as the stevedore in the charter party, so it was not employed by the master, but by the terms of the Act of June 23, 1910, a lien arose upon which it may now rely.

[9] Objection·is made to the $8 charge in the California Stevedore & Ballast Company's claim for hauling tarpaulins between wharves in San Francisco on the ground that this was not a maritime service. But it appears to have been incidental to the stevedore work, and its character is determined by the nature of the services in connection with which it was rendered. The same may be said of the five items of $1.50 each, "boat charges," in the bill for supplies of the Water-front Market and to the items of the Chesley Tug Company for· shifting scow alongside the Rupert City and handling lines on the scow. If one is allowed a lien for supplies or other necessaries furnished a ship, this must be held to include the reasonable cost of transportation·to the ship, since it is just as essential that this be paid as it is that the original value shall be paid. It appears that the scow was engaged in carrying ballast necessary for the use of the vessel in navigation.

## H. H. Williams' Claims.

[10] The commissioner refused to allow the claim of the master for wages as a lien on the vessel. In the absence of statute, it is well settled in this country that there is no lien on the ship for the wages of the master, as he is presumed to look solely to the credit of the owners. The Orleans v. Phœbus, 11 Pet. 175, 9 L. Ed. 677; The Imogene M. Terry (D. C.) 19 Fed. 463; 26 Cyc. 758.

The commissioner's reason for denying the lien is thus given by him:

"The contract of hire of Herbert H. Williams being made in this port, under the decision of the Supreme Court of the United States in The Roanoke, 189 U. S. 185 [23 Sup. Ct. 491, 47 L. Ed. 770], construing the statutes of this state applicable to foreign vessels, I conclude that said intervener is not entitled to a lien for his services as master."

The case cited held merely that a state statute could not create a lien upon a foreign vessel for materials furnished upon the order of a contractor, enforceable by a subcontractor regardless of whether such contractor had been paid, as this would be contrary to the general maritime law. But the master's right to a lien does not depend upon a statute of this state. He claims a lien under the statutes of Canada and England; the vessel being registered in British Columbia, and the owners being resident therein. The Canadian Shipping Act provides:

"Sec. 194. Every master of a ship registered in any of the provinces shall, so far as the case permits, have the same rights, liens and remedies for the recovery of his wages, and for the recovery of disbursements properly made by him on account of the ship, which, by this part, or by any law or custom, any seaman, not being a master, has for the recovery of his wages."

The British Merchants' Shipping Act of 1894, § 167, provides:

"The master of a ship shall, so far as the case permits, have the same rights, liens and remedies for the recovery of his wages as a seaman has under this act, or by any law or custom.".

The contract for the service of a master being a maritime contract, it is proper for a statute to provide that a lien shall arise therefrom, and such lien will be enforced in any other forum whenever it has ·

attached by virtue of such statute. By the general maritime law, the master is presumed to contract on the credit of the owners alone. By the British law, the parties are presumed to intend that the credit of the ship shall be pledged. The true inquiry is: What did the parties in this case intend? Did they contract in reference to the general maritime law, or in reference to the laws of Great Britain?

The fact that the contract was made in the United States and not in Great Britain does not prevent the law of Great Britain from being incorporated therein as one of its implied provisions. In The Magna Charta, Fed. Cas. No. 8,953, a seaman was employed by a British vessel at New York, yet the law of England was held to determine his rights under the contract of employment. Nor does the fact that the master was an American and not a British citizen prevent the law of Great Britain from applying. When he assumed the responsibilities of master, of a British vessel, his duties were prescribed by the laws of Great Britain, regardless of his own nationality. It would be unjust and illogical to measure his rights by different laws. The contract was with British owners to act as master of a British ship. The master knew that the ship was British and that he was dealing with British owners, and he testified that he relied upon the credit of the ship for his pay. In The J. L. Pendergast (D. C.) 29 Fed. 127, Judge Brown held that where a citizen of this country contracted to serve as master of a British vessel, believing the owners to be British, he was entitled to a lien under the British Merchants' Shipping Act. This case was reversed by Wallace, J., in (C. C.) 32 Fed. 415, who found the fact to be that the master believed at the time that the owner of the vessel was an American with whom he had contracted, and that as to such master the ship was an American and not a British vessel. The law of the previous case, however, is in no way criticised, and from the discussion of the learned judge it is evident that his holding would have been the same as that of Judge Brown had he found the facts as Judge Brown viewed them. The latter case is in harmony with the test of intention here laid down, since it could not there be presumed that the parties intended to contract in reference to the British law if the master believed it was an American vessel. The Alice Tainter, Fed. Cas. No. 195.

The contract of the master being made in reference to the British statutes, the lien on the vessel, was part of the consideration for his services of which it would be unjust to deprive him. Covert v. British Brig Wexford (D. C.) 3 Fed. 577; The Havana, Fed. Cas. No. 6,226. The master's lien is established, and he will be paid out of the proceeds of the vessel.

[11] The master takes exception to the finding of the commissioner that his wages terminated on May 28, 1913. It appears on that day that the vessel was taken in custody by the United States marshal pursuant to a monition issued at the inception of this proceeding. The control of her owners over her was then ended, and their power and the power of their agents to incumber her with liens necessarily ceased. The William Hoag (D. C.) 69 Fed. 742; The Augustine Kobbe (D. C.) 37 Fed. 702; The Young America (D. C.) 30 Fed. 790; 19 Am.

& Eng. Encyc. Law, 1094. The commissioner did not err in his finding as to the amount due the master for wages.

[12] The commissioner allowed the master $780 for advances made by him on account of the ship. Objection is made to various items allowed. As to the four items—"A. H. Wardall, expenses, to Vancouver, $45.00;" "Fred N. Beal, acct. Laundry, $16.30;" "Herr, Bailey & Wilson, libel on steamer, $165.00;" "British vice consul, $35.65" —the objection must be sustained. The master admitted that these sums were advanced by the owners. In fact, the $165 was sent to Herr, Bailey & Wilson by the managing owner direct. When asked why these items appeared in his account, the master stated that the whole was charged to him, that it was simply a "matter of bookkeeping," and that he considered he was liable to Capt. Humphrey personally. But no system of bookkeeping, however new, startling, or original can be permitted to alter the well-founded principles of the maritime law. The power of the master to hypothecate his vessel depends upon necessity. This necessity must be apparent as to each particular transaction out of which a lien is claimed to arise. There is no such necessity where the master is furnished with funds for the particular purpose at hand. It is only where there is or would be such a lien if the master did not make the advance that the master can claim a lien on the ship. 26 Cyc. 764; Gardner v. New Jersey, Fed. Cas. No. 5,233; The Orleans v. Phœbus, 11 Pet. 175, 9 L. Ed. 677.

The Canadian Shipping Act provides that a master shall have a lien for "disbursements properly made by him on account of the ship." It is obvious that a disbursement is not made on account of the ship where it is not to discharge or prevent the incurring of a lien, and that the general rule with respect to maritime advances must apply to the master's disbursements. The commissioner erred in allowing these items to the master; there being no necessity to pledge the credit of the ship where the managing owner had advanced the funds.

The same principles must ultimately determine the right of the master to a lien for other items advanced by him. The item of $12 charged as paid to the New Sailors' Home cannot be supported by a lien. The master stated that a portion of this was advanced by the home to the sailors and the other portion was charged by the home for supplying the men. It does not appear that the advance was made for the ship. There is no lien for services in procuring seamen. The Humboldt (D. C.) 86 Fed. 351.

[13] The items charged by the master for his expenses on shore are not secured by liens. They are: "Fares to Eagle Harbor, $5.00;" "Expenses at Seattle, $10.00;" "Expenses, Port Townsend to Seattle and return, $10.00." The transactions out of which these claims arose are not maritime in any sense. It would be a rather strained construction to hold them similar to the furnishing of supplies to the master on shipboard. Even though the owners may be liable for the expenses of the master incurred in connection with their business, the ship cannot be made liable where the transactions have no such connection with the ship as to enable the parties to claim that the credit of the ship was relied on. 26 Cyc. 751.

It is contended that the commissioner should have charged the master for money furnished to buy clothing for the men on the ground that this was for the "slop account" which was for the personal profit of the master. These items are: "E. & F. Kodiak, $5.75;" "Robert Ingall & Son, $55.38;" and "J. J. Baggeson, Melbourne, $40.09." No claim is presented by the master for these amounts. In his account with the owners he is charged with these amounts. The master's system of bookkeeping in connection with these items is thus explained by him. He credited the ship and debited himself with the money furnished and debited the sailors for the supplies they received. He said, "My book shows all these charges to them and will go into their accounts when these men are paid." Evidently, then, when the ship deducted the amount of these supplies from the men's pay, it would get back what it advanced, and if it were allowed to deduct it also from the amount due the master the ship would receive double pay. The commissioner committed no error with respect to these items.

Exception is taken to the failure of the commissioner to charge the master $50 for excess which it is alleged he induced the People's Market to charge wrongfully to the ship for his private benefit after the seizure. But it is obvious that the ship would not be liable for the $50 under the circumstances, and there is no reason for paying it this amount.

It is contended that the master should not have been allowed certain disbursements made by him at Melbourne because he had been furnished £190 for that purpose. The testimony shows that various amounts were paid by the master which do not appear on the account rendered. The evidence in this respect is not as clear as it might be, owing perhaps to the unsystematic method of keeping accounts, but in the face of the testimony of the master that he paid these various items with his own money and that the £190 was paid out for other expenses of the ship, I would not be justified in overruling the commissioner with respect to these items.

The other exceptions to the report of the commissioner with respect to the Williams' account do not call for discussion.

### H. H. Morrison & Co. Claims.

[14] The commissioner erred in allowing $25 for "brokerage charge." The testimony shows that these services consisted in aiding in the entry of the ship in the customhouse, and in attending to the "business" of the ship after the seizure. No lien exists for such charges. The Retriever (D. C.) 93 Fed. 480; The Crystal Stream (D. C.) 25 Fed. 575; The Thames (D. C.) 10 Fed. 848; The Joseph Cunard, Fed. Cas. No. 7,535; The Humboldt, 86 Fed. 351.

Nor can the items, "Head tax, 2 alien seamen, $8.00," and "Ship's laundry, $5.74," be recovered. Morrison stated that he had not paid but had merely assumed these amounts, and it does not appear that the ship was released from liability therefor. In other respects, the report of the commissioner as to the Morrison claims is correct.

### Frye and Swartz Claims.

These claims were for meats and lodging furnished for the crew on shore after the seizure of the vessel. They were properly denied. The Augustine Kobbe (D. C.) 37 Fed. 702; The Young America (D. C.) 30 Fed. 790; 19 Am. & Eng. Enc. of Law, 1094; Dalzell's Sons v. The Daniel Kaine (D. C.) 31 Fed. 746.

### People's Market.

[15] The People's Market excepts to the report of the commissioner in allowing no more than $100.06 for supplies. The supplies a lien for which was refused were furnished a sufficient time after the seizure as to imply that this creditor had notice thereof, and no error was committed in this respect.

### Marconi Wireless Telegraph Company.

The amount of this bill depended upon conflicting testimony as to whether the managing owner had notified the creditor that the ship would be laid up and to take the apparatus off the ship, in accordance with the contract. The managing owner testified that he had notified the company that the ship would be laid up and to take the apparatus off the ship, in accordance with the contract. The managing owner testified that he had notified the company that the ship would be laid up "for the present," and that they should take the apparatus off the ship. The testimony of the wireless company tended to show that after this notice it was informed that the ship would later come to Seattle and that notification would then be given that the apparatus be taken off the ship. In view of this testimony, I do not feel warranted in disturbing the findings of the commissioner.

It is hardly necessary to notice the exception that equipment and expenses in operating a wireless apparatus on a ship gives rise to a maritime lien, since it is obviously useful to the ship as an instrument of commerce and navigation. The fact that the contract was made with the owners is immaterial under the act of June 23, 1910, considered above.

### Max Kuner Claim.

It is claimed that the commissioner erred in allowing $85.30 for charts, etc., on the ground that the intervening claimant and Max Kuner stipulated that the value thereof was $55.15. I do not find this stipulation in the record.

A decree may be entered establishing the liens of libelants and intervening libelants as found by the commissioner and as herein indicated, and directing the payment thereof out of the proceeds of the vessel.