## Case No. 17,740.

WILLIAMS et al. v. The SYLPH.

[2 Betts, D. C. MS. 49.]

District Court, S. D. New York. Sept. 21, 1841.

BARRATRY—SEAMEN'S WAGES—SHARE IN PROFITS OF WRECKING—BARRATRY OF MASTER.

[1. The carrying off of a vessel, by her master, after her owner's death, to a port of a state other than that of the owner' residence, is an act of barratry, even if it be for the purpose of delivering her to persons supposed to be the owner's heirs, for it is to be presumed that the laws of the owner's domicile make provision for the proper disposal of the property.]

[2. In such case the right of one claiming a lien for wages is to be determined on the same principles as if the libel were filed in a court of the owner's domicile.]

[3. A mariner who shipped on a licensed wrecking vessel, under contract to receive compensation only by a share of the profits, acquires no right to wages by the fact that, on the owner's death, the vessel is carried off to a foreign port by the master, even if contrary to the mariner's will; and, if no profits were made, he can recover nothing from the ship.]

[4. Nor could a promise of the master to make reasonable compensation give the mariners any claim, as against the owner, it being notorious that he was committing a gross fraud and wrong against the owners in going off with the vessel.]

[This was a libel by Charles Williams and others against the schooner Sylph to recover wages.]

PER CURIAM. The vessel was employed under a license as a wrecker on the coast of Florida, and the libellants shipped on board at Indian Key, or Key West, under engagements to be compensated by shares of the earnings of that business. While the vessel was off the reefs, pursuing her business, the master, as it is alleged by the libellants, without their consent, and in violation of their rights, abruptly and tortiously left the cruising station, and brought the vessel to this port. It is also averred, in aggravation of damages, that the libellants were put upon an insufficient allowance of provisions on the passage, and were discharged on the arrival of the vessel here, without payment of their wages, or any means of support being provided them. The libellants claim wages for the full period of their contract, etc.

The vessel was the property of Jacob Houseman, a resident at Indian Key, where he died some time the last spring. He left a wife (but no children) residing at that place, and a father and brothers residing at Staten Island, in this state. The exemplification of a record of a testamentary paper from the county court of Monroe county, in the territory of Florida, was produced on the hearing to prove the bequest of this vessel to the widow of Jacob Houseman, and also letters testamentary, granted her by the same court, to administer as executrix upon the estate of her husband. These papers were objected to as not authenticated by competent evidence. It is not necessary to discuss or decide this question of evidence, because, by the principles of universal law, the disposal of the vessel as part of the personal estate of the deceased must be in correspondence with the law of his domicile. Story, Confl. Laws, pp. 312, 313, c. 9. Whether the will of Jacob Houseman made a valid bequest of this vessel to his widow, or, if not, who is entitled to it by inheritance, are questions, therefore, which are governed by the laws of Florida, and not those of New York; and those questions are to be disposed of as if brought to adjudication before a court of that territory. 1 Story, Confl. Laws, p. 403, c. 12.

The evidence offered, and the reasoning upon that evidence, tending to show that the vessel was brought off by the master for the purpose of delivering her up to the father and brother of Jacob Houseman, in this state, as entitled to her by inheritance, could be of no avail, even if it was proved that the act was done at the instance of those persons. The act would be tortious in respect to the change of property, and no right to wages would accrue thereby that did not exist or arise upon considerations independent of it, because there is no proof that the father would be heir to the deceased son by the laws of Florida, and none that the inheritance would descend to brothers, and accordingly the court cannot presume any interest, in the Housemans residing here, in this vessel, or regard any implication tending to show that the master acted under their authorization in bringing her out of her home jurisdiction. The claim to wages cannot, accordingly, be supported upon any supposed employment of the Housemans here in derogation of the authority and interests of the owner in Florida. As, therefore, the property in this vessel is determinable solely by the law of the late owner's domicile, and as it is to be presumed that suitable provision is there made for its possession and disposal, the demand of the libellants now in suit against it is to be examined, in respect to the act of bringing her away, as if prosecuted in that jurisdiction, or the same as if defended here by a claimant having a right to the property clear of all exception.

If the vessel was carried off by concert with the crew, or their consent, the act would be equally barratrous with respect to the mariners as the master, being a fraudulent act committed jointly by all, in prejudice of the owners of the vessel. Abb. Shipp. 138, § 2; [Patapsco Ins. Co. v. Coulter] 3 Pet. [28 U. S.] 222; [Columbia Ins. Co. of Alexandria v. Lawrence] 10 Pet. [35 U. S.] 517; [Waters v. Merchants Louisville Ins. Co.] 11 Pet. [36 U. S.] 221. Services rendered in a willful deviation or breaking up of the voyage can afford no foundation for a claim of wages by any one taking part in such act. Supposing the sailors free of all intentional agency in the transaction, and that the act of the master was a fraud upon them equally as upon the owner, is the vessel still liable to them for their services? There would be much greater difficulty in discharging the ship from such claim in cases of ordinary hiring; for, although the engagement may be for a specific voyage, and the vessel be by the master immediately run upon one totally variant from it, yet, as the seamen have no control in the navigation of the vessel, are usually in no way consulted, and are not supposed to know anything on the subject, their equities might well be regarded as continuing unaffected by such proceeding of the master, and the lien be preserved to them notwithstanding the barratrous conduct of the master. The present case is distinguishable from that of an ordinary hiring in this great particular: that the libellants, shipping for shares, have no specific lien on the vessel until the earnings of the vessel are ascertained and liquidated.

In the common case of a contract with sailors, a violation by the master, either in withholding from the men the employment engaged for, or in putting them upon a different service, the court may still regard it as continuing in force for the benefit of the seamen, and give them the same remedies as if it had been executed according to its terms. Wages would accordingly be decreed in such cases, upon the basis of the contract, and in conformity to its stipulations; the equity of the court only extending its application to the mere services imposed upon the crew. Here, however, it is admitted that no remedy can be afforded upon the contract itself. There never existed any lien upon the vessel, and the very nature of the undertaking imported that the men might work out the whole period of their engagement without ever acquiring any privilege against the vessel. To charge her with wages would be in direct subversion of the agreement and intention of the owner. He victualled and fitted her out, and allotted her to this enterprise; the men putting their labor in the common risk with his advances, to be recompensed or not according to the result of the adventure. Manifestly, therefore, the obligation of the owner to the mariners was this only: that he, and consequently the vessel, should be bound to give them their proportion of the earnings of this particular undertaking. The court cannot look out of this agreement, and frame a new one, that might be better calculated to protect or indemnify the men. Hoyt v. Wildfire, 3 Johns. 518, is a strong case to show how far this court will

go in securing to seamen the benefit of their contract. Although the services stipulated for are not performed, I think the doctrine of that case is sound, and that the liability of the vessel is commensurate with that of the owner; and it is clear, from the principles there declared, and the cases by which the decision is supported, that the contract will be upheld and enforced in behalf of the seamen, notwithstanding the failure of the voyage, when the failure is produced by the wrongful act of the master. The case, however, embodies no principle sanctioning an authority in the courts to substitute, in place of the contract, a new liability, distinct and variant in every feature from the stipulation between the parties, and attach the equities so raised in place of the contract upon the vessel.

The difference is wide between compelling an owner to fulfill his contract to a sailor who has not performed on his part, because prevented by the tort or laches of the master, and abrogating the contract, and raising a new one in behalf of the seamen for that cause. I should regard it a dangerous principle to admit into the Maritime Code that an interruption or violation of seamen's contract, committed by the master, or any of the men, or owner, would entitle the crew to receive from the courts, by implication, a new and better one, and have that enforced against the ship. Substituting, in this case, the highest rate of wages allowed at Indian Keys, or even reasonable money wages, in place of the shares stipulated for, might prove a most advantageous change of the agreement to the men, and a ruinous one to the owner; but, whether so, or the reverse, the court would by such proceeding assume to itself the power of granting privileges and imposing liabilities ex mero motu, and without the concurrence of the parties themselves,—an authority of doubtful utility in any court, but one which it is believed courts of admiralty never exercise. The libellants, then, having no right of action here upon their contract for earnings under it, if any were made, until the voyage shall be adjusted, and the proportions liquidated, and this court having no authority to decree for wages otherwise than in consonance with the contract, express or implied, whether upon a completion or abandonment of a voyage, the suit of the libellants, in so far as it rests upon this ground, must fail.

Nor does the allegation in the libel, if supported by proof, that the master promised the libellants, after the schooner arrived here, to make them a reasonable compensation in lieu of their stipulated wages, vary their case in respect to the owner or vessel. It was notorious to them all, then, that he had committed an act, if not of piracy, of gross fraud and wrong upon the owner in running off with the vessel, and that his engagements to them under such circumstances were not intended to be for the benefit of the owner, but, on the contrary, to his injury and ruin. If the engagement had been most formal and explicit, it could not be permitted the master and crew, under such circumstances, to abandon the subsisting contract, and create a different one. This would be no execution of his trust as agent in hiring a crew. Story, Ag. 109, 111. Independent of the want of authority in the master to bind the owner by a stipulation of that character, the libellants could not, however honestly made, enforce it, because the consideration was already executed and past; all their services, except nine days, having been rendered under a contract of a totally different nature.

Upon the facts charged in the libel, the prayer seeks recompense for the tortious abandonment of the voyage by the master, and bringing the libellants against their will to a port foreign from the place of their shipment. The answer asserts that the libellants concurred in the act, and that it was jointly done by all, with intent to defraud the owner. Putting the case, however, upon the allegations and proofs of the libellants alone, it does not appear to me that they make out a right of action against the vessel. The testimony of the libellants themselves makes the transaction piracy on the part of the master. He ran away with the vessel, and carried her to a port foreign from her home one, and delivered her up to those who had no authority in or over her. If such be the true complexion of the act, there certainly can arise out of it no right or equity on the part of the seamen to charge the injury they received to the owner, and make the vessel responsible for its satisfaction. It becomes, in respect to the seamen, merely a personal tort committed by the master,—the same, in effect, as a forcible imprisonment and kidnapping of the men. Owners are not liable for torts of that nature, nor for any that do not flow naturally from the relation of the master to the vessel, so as to fall within the scope of his agency. A close scrutiny of the proofs will, however, scarcely entitle the libellants to assume this to be the real posture of the case. There are manifold particulars conducing to show that they lent themselves willingly to the purpose of the master, and were ready participants in his malconduct. If such be the legitimate conclusion of the evidence, it disarms the occurrence of any appeal to sympathy in their behalf, and subjects them most justly to bear a part of the evil and loss inflicted by the act. Without adjudging that the testimony leads to such conclusion, the court upon the other features of the case, decrees that the libellants have established no right of recourse to the vessel for services rendered, for abandoning the voyage, or for tortiously bringing them to this port.

The case of Vidall, the cook, is supposed to be distinguishable from the others, inasmuch as his contract was for $8 per month money

wages, besides a half share of the profits of the adventure, and that he can now demand his money compensation at least. Admitting the contract with him to be of a separable quality, so as to give him an entire remedy for such provision, and that he can proceed for the amount of the money stipulated against the vessel for any wrongful violation of the agreement by the master, and also admitting that the evidence is insufficient to convict him as a willing participant in the wrongful act, it is yet insisted by the claimant that his demand is fully satisfied by payments made him; and it is proved, in support of that allegation, by a witness here, who paid him $8, that the cook then said that sum was all that was owing him. This is a sufficient bar to his action in this behalf. I am accordingly of opinion that, if there be any unsatisfied demand in favor of the libellants, it is not proved to be of a character which gives it a lien on the vessel. Ordered that the libel be dismissed.

[For subsequent proceedings by William D. Bradshaw, part owner, to recover possession of the vessel, see Case No. 1,791.]