THE AUGUSTINE KOBBE.

REVERE COPPER Co. *et al.* v. THE AUGUSTINE KOBBE.

(*District Court, S. D. Alabama.* December 22, 1888.)

1. MARITIME LIENS—SEAMEN—WAGES AFTER SEIZURE OF VESSEL.
   Sailors who ship at New York for a voyage via Mobile to South America and return, are entitled, upon the seizure of the vessel under process at Mobile, only to wages then due, it appearing that they can obtain other similar employment at equal or better wages, and there being no proof of any special damage or of return expenses to their homes.

2. SAME—MATE—ASSISTANCE TO MARSHAL.
   A mate who remains on the vessel after her seizure, and assists the marshal in handling her, acquires thereby no maritime claim to be enforced against the proceeds of the vessel.

3. SAME—STEVEDORES—STATUTORY LIEN—RANK.
   Stevedore services do not constitute a maritime claim so as to impose a maritime lien on the vessel; and a state statutory lien for such services is inferior to liens conferred by maritime law.

4. SAME.
   The services of a boss stevedore in unloading the cargo constitute a statutory lien ranking after maritime liens.

5. SAME—SUPPLIES—AFTER DISCHARGE OF CREW.
   One who supplies meat to the vessel at Mobile, and who has been allowed therefor up to and after the seizure, cannot be allowed for supplies furnished after the discharge of the crew.

6. SAME—ADVANCES TO CAPTAIN.

One advancing sums to the captain for necessary disbursements of the vessel is entitled to a maritime lien, but not for sums advanced to him for his own purposes.

7. SAME—CAPTAIN'S DRAFTS.

Where the captain gives drafts on the consignee for necessary repairs, which drafts are accepted by the consignee, a statement by him that they had been paid, which he afterwards retracted by sending them to be presented against the vessel, does not prevent the enforcement of the claim against the vessel by one to whom the captain, to avoid seizure, had given a draft in payment of the former drafts when presented. Commissions and other charges above the actual loan should however be disallowed.

8. SAME—DAMAGES FOR BREACH OF CHARTER-PARTY.

If freight has advanced since the execution of the charter-party, the difference is an element of damage for breach; also commissions provided for in the instrument, which apply to advances made under it, are elements of damage; and the claim for these damages constitutes a maritime lien on the vessel.

9. SAME—PAROL AGREEMENTS.

Evidence of a parol agreement by charterers to advance sums to meet drafts made previous to the execution of the charter-party is inadmissible to vary or add to the written contract, which is held to have merged all previous agreements.

10. SAME—PRIORITY—LEX FORI.

The priority of liens against a vessel seized under process is governed by the *lex fori*; and a lien of a certain rank given by a state statute for repairs made in such state will be recognized as a lien, but not of the rank given by the statute.

11. SAME—WAIVER—ATTACHMENT IN STATE COURT.

An attachment of a vessel in a state court, as property, under a misapprehension, and a subsequent release, do not waive a maritime lien on the vessel.

12. SAME—MORTGAGE—REGISTER.

A mortgage on a vessel, to be effective against strangers, must be duly recorded at the port of her owner's residence.

In Admiralty. On exceptions to master's report.

The bark Kobbe was seized at Mobile September 12, 1888, under libel of the Revere Copper Company, for copper claimed to have been furnished at New York to her as a foreign vessel. The captain had given sundry drafts payable at Pensacola, whither, under a charter to Chiesa, (see *Chiesa* v. *Conover*, 36 Fed. Rep. 334,) the vessel was to have gone to take on a cargo of lumber for South America. Calling at Mobile to deliver freight, the master, Conover, whose wife was the owner, and aboard the bark, made what he conceived a more favorable charter than the South American one, and so abandoned that. He claimed that he had done this on the promise of the new charterers, Martin, Taylor & Co., of Mobile, in the presence of J. R. Edwards, to advance about $3,000, to be sent holders of the drafts on Pensacola, being about 50 per cent. of these claims, and thus satisfy them. This agreement was not included in the charter-party signed August 31, 1888. The Revere Copper Company, learning that the vessel had not proceeded to Pensacola, libeled her at Mobile, and other claims were also sent to Mobile for collection. After fruitless negotiations Gokey & Son of Jersey City, N. J., libeled on September 17, 1888, for repairs made at that place as to a domestic vessel, claiming under the New Jersey statute of April 24, 1884, and alleging the home port of the vessel to be in New Jersey. This was the

allegation of all pleadings subsequently filed. C. E. Steelman and other sailors libeled September 27th, claiming wages for a round voyage from New York, where they shipped in July, 1888, for South America via Mobile and Pensacola, and return to the United States, alleging that this voyage had been broken up by the act of the master at Mobile. A large number of other claims against the vessel were then filed from time to time by libel or petition, covering the period from her purchase by the Conovers in the fall of 1886 down to the seizure at Mobile. During that time the vessel had been fitted out at Portland, Me., and made a long voyage to South America and return under Steelman as master, lasting from January, 1887, down to her arrival at Providence, R. I., May, 1888, and embracing sundry adventures and trading trips from point to point in South and Central America. At Providence a stevedore named Adamson discharged her cargo of logwood, and Gladding and Braley advanced $1,000, which went to pay the seamen's wages for the past voyage. From Providence the Kobbe had been towed over to New York harbor, and had undergone coppering and general overhauling at Gokey's docks in Jersey City. This done, she started on the second voyage to South America, in pursuance of the charter Steelman had made with Chiesa at Rosario, shipping new sailors at New York for that voyage, and Conover, husband of the owner, taking charge as master, with Steelman as mate, calling at Mobile in August, where she was seized as above related. On October 1st a reference to Richard Jones as special master was ordered for the purpose of taking testimony and reporting on the various claims and their priorities. Pending its execution the Kobbe was sold under order of court for $6,350, and the money paid into court by the purchaser, Edwards. The special master reported November 9, 1888, classing the priority of the claims as follows: (1) Seamen's wages. (2) Maritime liens: (a) incurred on voyage from New York to Mobile; (b) voyages in South America and return; (c) voyage out to South America from United States. (3) Statutory liens for repairs and stevedores. (4) Mortgage. (5) Claims without lien, (including advances at Mobile by Martin, Taylor & Co., Adamson's Providence stevedore claim, and advances of Gladding & Braley there. (6, 7) Claims not proven, fictitious and prospective, (including seamen's wages for unfinished voyage, and the alleged damages of Martin, Taylor & Co.) To this general classification no exception was made, but numerous exceptions, passed on in the opinion, were filed by creditors to their own rank in this table.

*G. L. & H. T. Smith*, for Revere Copper Company.

*Hamiltons & Gaillard*, for Steelman *et al.*, sailors, and for sundry petitioners.

*D. C. & W. S. Anderson* and *Hamiltons & Gaillard*, for Gokey & Son.

*Pillans, Torrey & Hanaw*, for Martin, Taylor & Co., and sundry petitioners.

*J. L. & T. H. Smith*, for Doughty and Edwards.

*R. I. Smith*, for Gladding & Braley and Adamson.

*W. D. McKinstry, H. Chamberlain*, and *R. P. Deshon*, for sundry petitioners.

TOULMIN, J., (*after stating the facts as above.*)   The undisputed evidence as to the seamen is that they duly shipped at New York on the American bark Augustine Kobbe for a voyage from New York via Mobile and Pensacola to South America and return, but that on the breaking up of the voyage at Mobile by seizure under the process of the court they were here discharged.   Under the circumstances of this case, I cannot allow more than the wages due at the time of seizure.   There is no proof of any special damage, and besides the evidence tends to show that they could have obtained other employment of like character and at as good or better wages.   I might have allowed expenses of return to their homes, but there is no proof on this point.   Their exceptions are overruled. *The Esteban De Antunano*, 31 Fed. Rep. 920.

Waganer supplied meat to the vessel at Mobile, and excepts to not being allowed for supplies after discharge of the crew.   By analogy to the seamen he has been allowed for what was furnished up to and even after the seizure, and his exception must be overruled.

In my opinion the evidence sustains the master's report that Edwards paid $40 to the captain for his individual use.   This, therefore, is no lien upon the vessel.   His exception to having his claim for money paid stevedores at the captain's request ranked after maritime liens cannot be sustained.   In this circuit it is well settled that stevedore services do not constitute a maritime claim, and that if they are entitled to any lien at all it is under the state statute.   *The Ilex*, 2 Woods, 229.   The rule is equally well settled here that a state statutory lien is inferior to that conferred by the maritime law, and must rank after maritime claims.   The exceptions of Edwards must therefore be overruled.

The special master erred in disallowing the claim of Martin, Taylor & Co., for damages sustained by them by reason of the breach of the charter-party made August 31, 1888.   The master found that this breach was caused by their default in that they failed to advance sufficient funds to satisfy holders of drafts payable at Pensacola, (drawn on the faith of a charter previously made by the master with one Chiesa, which had been abandoned,) which Martin, Taylor & Co. verbally agreed to do previous to the execution of their charter-party, and that in consequence of such failure these creditors seized the vessel in Mobile, and thus the voyage to Europe, for which Martin, Taylor & Co. had chartered her, was broken up.   But it does not appear from the evidence before the court that such breach was caused by their default.   Any evidence of their failure (if there was a failure) to comply with an agreement made by them preliminary to the execution of the charter-party or contemporaneously with it and inconsistent with its terms, cannot be considered by the court.   Such parol evidence is inadmissible to vary or add to a written contract, which must be held to have merged all previous agreements, if any.   *Bast* v. *Bank*, 101 U. S. 93, 96;   *The Delaware*, 14 Wall. 579.

But the evidence submitted on the subject is not sufficiently clear and definite to satisfy me as to the amount of damages to which they are entitled, or as to the items that go to make up their damages.   As to this

I will permit further testimony to be taken.   If freight has advanced since the execution of the charter-party, the difference of freight will be one of the elements of loss.   The commissions provided for in the charter-party so far as they apply to advances made under it, will enter into the loss, and any sums advanced as advanced freight should also be included.   But the claim for loss of dogs and chain and for timber furnished for a yard is a separate claim for supplies furnished, and is not a part of the damages for breach of the charter-party.   I consider that Martin, Taylor & Co.'s claim for damages from breach of charter comes under the head of maritime claims, immediately after towage and pilotage on the last voyage into Mobile, and their exceptions are sustained. *The Maggie Hammond,* 9 Wall. 435; *The Director,* 34 Fed. Rep. 57.

Gokey & Son repaired the bark Kobbe on their docks at Jersey City, N. J., after her return from a long voyage to South America back to Providence, R. I.   The master may have contracted for the copper in New York, but it is amply shown that none was delivered to the vessel until she was high and dry on Gokey's docks in Jersey City, when Gokey repaired and coppered her.   The law of New Jersey gives repairers a lien next after seamen, and it is argued for Gokey & Son that this lien or priority entered into and was a part of their contract.   Gokey & Son claim that without regard to what the rule would be in cases arising within the limits of this circuit, in their case, arising in a circuit where a statutory lien is ranked equal to maritime liens, their lien is a part of their contract, and must be enforced in any forum as superior to all claims except for seamen's wages.   I have been much impressed with the able argument submitted by Messrs. Hamiltons & Gaillard on the Gokey claim, and must confess that I am not certain that my conclusion that the lien is a part of the remedy, and not a part of the right, is the correct one. If this be so, however, the law of this forum must govern, and that ranks statutory liens after maritime.   So long as I am in doubt as to whether there is error in the master's report on the claim, I think it my duty to sustain it, and overrule the exception of Gokey & Son.   If I felt free to follow my individual views on the questions presented, I would sustain the exceptions.   While this court must recognize the lien given to this claim by the New Jersey statute, it can only recognize and treat it as a statutory lien, and, following the decisions in this circuit, must place it in a rank inferior and subordinate to maritime liens.   The original libelants, the Revere Copper Company of Boston, furnished in New Jersey the copper that Gokey there put on the vessel's bottom.   They originally claimed a maritime lien, but have now amended so as to claim a lien under the evidence without defining whether it is maritime or statutory. I consider this claim as in the same category with the Gokey claim, and the Revere Company's exceptions must likewise be overruled.

On the return of the vessel from South America, John S. Adamson, as boss stevedore, unloaded her cargo at Providence.   The master properly classes the charge for that service as having a statutory lien ranking after maritime liens.   Of the amount advanced to the captain by him $93.06 was shown to be for necessary disbursements of the vessel, and this gives

a maritime lien; but the remainder of the advances were to the captain for his own purposes, and this could give no lien against the vessel. To enforce his claim, Adamson, like Gladding and Braley, who advanced at Providence $1,000 that went to pay off the sailors of the South American voyage, attached the vessel in a state court as property, but, finding they were acting under a misapprehension, finally released her. .This has been expressly decided not to waive a maritime lien. *The Boggs*, 1 Spr. 369. Gladding & Braley are entitled to rank as the seamen whom their money paid off would have done, and Adamson to claim the $93.06 advanced the ship; but they are not entitled to claim as a part of their debts the costs of the attachment they procured and voluntarily released.

While in South American seas the Kobbe met with a severe storm, which drove her into Montevideo for repairs, to effect which Capt. Steelman borrowed $570 from Stewart & Williams, giving a draft on one Princesca at Rosario, to be paid out of the freight on the cargo which the Kobbe loaded for that place. While at Rosario, Princesca, who was consignee, told Steelman that these drafts which he had accepted were paid; but upon discovering, as he claimed, a deficiency in the amount of the cargo, Princesca receded from that, and forwarded them, with additions, (making a total of $716,) to Rio de Janeiro, to be presented to the vessel. Steelman took legal advice in the matter, and to avoid seizure recognized the claim, paid part, and gave a draft for the balance. This draft is now presented by J. F. Whitney & Co., who are in the same position as the original lenders. The master, in his report, has allowed the amount of the actual loan but refused to allow for the commissions and other charges above the actual loan. I sustain the report, and must overrule the exceptions seeking now to disallow any payment because of Princesca's statement at Rosario that the original drafts were paid. Capt. Steelman at Rio acquiesced in the claim when presented, and I cannot say he did not act wisely and within the general discretion the master must exercise in a distant foreign port.

Shortly after purchasing the vessel, the Conovers gave a mortgage on her to Richard Doughty for $3,000, and he is shown to reside, like them, in New Jersey. The amount has been reduced now to $2,000, and this is claimed out of the proceeds of the sale made under decree of this court. The mortgage was recorded at Portland, Me., while the home port of the vessel, being that of her owner, was in New Jersey. A mortgage on a vessel, to be effective against strangers, must be duly recorded at the port of her owner's residence. Rev. St. § 4192; *The Jno. T. Moore*, 3 Woods, 61. That not having been done in this instance, the mortgagee can claim nothing except out of remnants, if any, and his exceptions are overruled.

Steelman, who was mate on the voyage to Mobile, has remained on the Kobbe since her seizure, and files a petition seeking compensation for services in aiding the marshal in handling her. Of whatever merit the claim might be as a part of the marshal's expenses, if recognized by him, it certainly is not a maritime claim to be enforced against the proceeds of the vessel. His petition and motion must be refused. Except as hereinabove modified, the master's report is in all things confirmed.