THE PACIFIC HEMLOCK (BAARSTAD et al., Interveners).

THE PACIFIC PINE (SODERBERG, Intervener).
THE PACIFIC SPRUCE.

TIETJEN & LANG DRY DOCK CO. v. DIMON SS. CORPORATION et al. (ULVESTAD, Intervener).
Nos. 13242, 13243, 13217, 13245.

District Court, W. D. Washington, N. D. May 7, 1932.

See, also, 1 F. Supp. 593.

Anthony Savage, U. S. Atty., and Jeffrey Heiman, Asst. U. S. Atty., both of Seattle, Wash., and Wm. R. Fitch, of Washington, D. C., Counsel, U. S. Shipping Board.

Bronson, Jones & Bronson and Robt. E. Bronson, all of Seattle, Wash., and C. A. Turner, of Everett, Wash., and Karr & Gregory and J. K. Forrest, all of Seattle, Wash., for interveners.

John Ambler, of Seattle, Wash., for ancillary receiver.

NETERER, District Judge.

The United States, through its Shipping Board, having been permitted to sue the receiver of the Dimon Steamship Corporation appointed at the suit of the Olympic Stevedoring Company v. Dimon Steamship Corporation, in equity, and intervening libels having been filed on behalf of the seamen for unpaid wages, the wages of the seamen being in dispute, and with a view of an early determination of the seamen's claims, it was agreed in open court by all parties that the United States, by the United States attorney and Mr. Wm. R. Fitch, attorney for the Shipping Board, may be considered to have filed a general denial to the claims of all of

the seamen in the intervening libels. The cause was regularly assigned for trial, and the claims of all of the seamen against the Pacific Hemlock, the Pacific Pine, and the Pacific Spruce were heard before the court; written stipulation having been entered into in open court between the proctors for the libelants, the proctors for the intervening libelants, and the ancillary receiver of the Dimon Steamship Corporation, and the United States attorney and the attorney for the United States Shipping Board.

I. From the stipulation and the testimony which was produced, the court finds that the Pacific Spruce completed a voyage from the port of New York to the port of Seattle, at which latter port the crew was paid; that a voyage from the port of Seattle to the port of New York was then inspired and articles signed, January 4, 1932, for a voyage from the port of Seattle to an Atlantic Coast port. Cargo was immediately taken for the new voyage at various Puget Sound ports. On January 15, 1932, while taking cargo at Everett, Wash., the vessel was libeled, which was shortly thereafter dismissed, but, pending the libel, taking cargo was not interrupted. On February 15, following, at the port of Everett, the ship, almost loaded, was again libeled, which is pending. The crew continued the regular duties aboard, and the owners endeavored to release the vessel, and inspired the crew into believing this would be done, and the voyage continued. No watchman was put on board.

On April 2, 1932, an ancillary receiver was appointed by this court at the suit of the Olympic Stevedoring Company, and the ancillary receiver took possession of the ship; the crew being maintained aboard. About the 8th of April, the receiver wrote a letter to the masters of the several vessels, disclaiming ability to pay the crew, but suggested the crew might remain on board at the ship's expense. Disquietude was occasioned among the crews by the letter, and the receiver, believing that serious hardship would be created if the men were forced to leave the vessels with no funds, permitted them to remain aboard the ships at the ships' expense until some funds were forthcoming, and by so doing they would safeguard their rights and compensation for the services they had performed and were performing. The crews relied upon the assurances, and continued to stand by and did perform their regular duties at the port of Everett until the 28th day of April, 1932, when, under the direction of the receiver, the crew navigated the vessel to Seattle and into Lake Union, where the receiver ordered the ship laid up, and discharged the crew.

Later, April 28, the officers of the Pacific Spruce received the back pay for the wages for the outward voyage from New York, and all of the crew were paid wages to February 15, 1932, with additional two weeks' pay, by the United States Shipping Board; and they have received no compensation for services from the 1st day of March until the time of their discharge on the 28th day of April, 1932.

II. The Pacific Hemlock arrived in Puget Sound from the port of New York March 15, 1932. The intervening libelants aboard performed their regular duties until the 28th day of April, 1932, at which time they were discharged by the receiver and their wages paid to the 2d day of April, 1932, by the United States Shipping Board.

III. The Pacific Pine entered the port of Seattle, February 21, 1932, and all cargo was discharged by February 23d, on which date a libel was filed against the vessel and arrest made. No watchman was placed on board. On February 24th, the vessel was moved from Pier 5 to the Connecticut street dock, and on March 2d the ship was moved to the East waterway dock. On April 23d the United States Shipping Board paid their wages due under the articles on the incoming voyage, and took an assignment of the claims. The officers and crew continued their regular and ordinary duties from February 23, 1932, to and including April 23, 1932, on board the vessel. On April 29, 1932, the master, Soderberg, assisted in moving the vessel from the East waterway dock to Lake Union. He has been paid nothing for his services from March 20, 1932, to April 23, 1932; nor for his services in moving the vessel April 29, 1932.

The owners were insolvent, but expressed hope that satisfactory arrangements could be made to continue operation of all vessels involved, and were much interested in having the crew of the Pacific Spruce as a body conserved, with a view of carrying forward the marine enterprise. Neither of the vessels in issue, except the Pacific Pine, was laid up until the 28th day of April, 1932, when the owners determined that efforts were futile. The seamen worked in good faith performing their usual and regular duties.

The services of the seamen, no doubt, contributed to the preservation of the vessels and maintained them in good condition, thereby preventing impairment, and, in ef-

fect, maintenance of the fund available to the court for the common benefit of all persons interested in the vessel.

From these facts I think the conclusion must follow that the rendition of mariners' services import liens, without a doubt, until April 2d, when the receiver took possession. The receiver was not engaged in navigating the vessels, he was interested in maintaining the vessels in equipped and active relation for instant operation in undertaking any voyage, inspired by the owners, which activity was, I think, known to the United States Shipping Board, and, if not shown by the evidence on this trial, by statements made in open court in some matter in the receivership proceeding, together with disclosed circumstances; and this maintenance of condition and relation was of value, and the care exercised and services performed in repairing, chipping, and painting, valve grinding, etc., was of undoubted value, and still obtains; and this was all performed on the credit of the ship, and the prima facie evidence of lien is not negatived by nonoperation until the appointment of the receiver, at any rate, and does not suggest that, in good conscience at least, the liens for some of the wages may not be suspended. See The Washington (D. C.) 296 F. 158; The Resolute, 168 U. S. 437, 18 S. Ct. 112, 42 L. Ed. 533; The Nisseqogue (D. C.) 280 F. 174. See, also, The J. S. Warden (D. C.) 175 F. 314; The Poznan, 274 U. S. 117, 47 S. Ct. 482, 71 L. Ed. 955, 1927 A. M. C. 723.

The receiver acted in good faith for the common benefit of all interested in the vessel and assets or funds in the course of administration, and it is not enough to say that the voyages were broken up and that the seamen were maintained on board the ships for all of the time at their election, for which no payment should be made. They were required to and did various acts in the movement of the vessels and in cleaning, repairing, painting, etc. The ships are funds in custodia legis. The services, after receivership, if not strictly within maritime requirements, are incidents to the judicial administration of the funds, and contributed to the preservation thereof for the common benefit of all, and in equity and good conscience the enjoyment of the fruits of these services, under the disclosed circumstances, should not all be taken from the seamen—an investment of their whole time, their total capital, and not merely an increment of invested capital.

While the seizure of a vessel under a libel breaks up the articles, and no lien attaches while the vessel is in custodia legis [The Philomena (D. C.) 200 F. 873; The Bethulia (D. C.) 200 F. 876; The Astoria (C. C. A.) 281 F. 618; The Poznan (C. C. A.) 9 F.(2d) 838], the crews in the instant cases did more than remain as watchmen on board by sufferance to "avoid harshness of enlarging them without funds," they were continued in the expressed hope of the continuance of the marine enterprise, with the knowledge of the mortgagee, the United States Shipping Board. The Shipping Board, however, did nothing more than afford time to the owners to finance the enterprise, and it was a commendable act in paying the seamen the wages stated, and take assignment of the claims. The seamen knew the status of the enterprise, and, after the receiver's letter on April 8th, had explicit knowledge.

I think the unpaid seamen should be paid the regular wage, in the case of the Pacific Hemlock, to the 2d day of April; and, in the case of the Pacific Spruce, full wages to April 2d; and, in the case of the Pacific Pine, to April 2, 1932; and after this date the respective crews should be paid a sum equal to 40 per centum of their wages. These sums, with subsistence, I believe to be fair and equitable. The seamen on the Pacific Spruce, after the libel, were at liberty to leave the vessel; and the seamen on the Pacific Pine, after the ending of the voyage, February 23d, and the Pacific Hemlock, after March 15th, but were not required to leave without provision for subsistence and payment of wage claims, at least for a reasonable time.

No claim is made for penalty (double wages), nor could it be sustained, if made, since the cause of the default is insolvency of the owner. The Supreme Court in Collie v. Fergusson, 281 U. S. 52, 50 S. Ct. 189, 191, 74 L. Ed. 696, said: "That the liability is not incurred where the refusal to pay is in some reasonable degree morally justified, or where the demand for wages cannot be satisfied either by the owner or his interest in the ship. * * * "

Nor has section 4527, R. S. (46 USCA § 594), application. The voyages from the East Coast were ended at the port of Seattle. Articles for voyage of the Pacific Spruce from the port of Seattle to the East Coast were executed January 4th, and immediately

was "ground broken." The vessel was libeled February 15th.

The Supreme Court in The Steel Trader, 275 U. S. 388, 48 S. Ct. 162, 163, 72 L. Ed. 326, held this section to be applicable where the wrongful discharge is "before the commencement of the voyage," and if it occurred after such commencement, but "before one month's wages are earned." Nor is transportation to the Eastern Coast conceivable, since the voyages ended at the port of Seattle. The voyage of the Pacific Spruce in issue began in Seattle. It was ended by the financial collapse of the owner. The seizure of the ship under libel ended the conditions of the articles, and thereafter no liability thereunder could attach.

It appearing that the United States seeks by libel to foreclose marine mortgages against the several vessels, the seamen on Pacific Hemlock and seamen on Pacific Pine having intervened in the respective foreclosure cases, the seamen on Pacific Spruce having intervened in the case of Tietjen & Lang Dry Dock Company v. Dimon Steam Ship Corporation, etc., and Pacific Spruce (cause No. 13217), it is ordered that the last-named case be consolidated with the case of United States v. Pacific Spruce (cause No. 13245); and that the findings against the several ships on wage claims here be considered as in the several consolidated causes, and that one consolidated decree be entered against each ship in the respective foreclosure cases, in which the various lien claimants against the respective ships will be protected, and that this memoranda be considered the finding of the court with relation to these several marine claimants.