**OLD POINT FISH CO., Inc., v.
HAYWOOD et al.**

No. 4563.

Circuit Court of Appeals, Fourth Circuit.

Feb. 7, 1940.

PARKER, Circuit Judge, dissenting.

J. L. Morewitz, of Newport News, Va.
(Morewitz & Morewitz, of Newport News,
Va., and R. Arthur Jett, of Norfolk, Va.,
on the brief), for appellant.

Henry Bowden, of Norfolk, Va. (Bowden & Winder, of Norfolk, Va., on the
brief), for appellees.

Before PARKER, Circuit Judge, and
COLEMAN and CHESNUT, District
Judges.

CHESNUT, District Judge.

This case presents an unusual if not
novel question of admiralty law. A fishing
vessel has been libeled and sold at the instance of lien claimants for repairs and
supplies. Four members of the crew,
whose compensation was to be based on a
percentage of the proceeds of the catch,
have filed intervening libels for an estimated percentage of the profit which might

have resulted from a catch which was not made, because the voyage was terminated a few days after it began by the necessary return of the vessel to port for repairs, and before they were made the vessel had been libeled. The repair and supply claims approximate $16,000, while the vessel sold for $5,900. The members of the crew contend that the sums due them, as for wages, are entitled to payment in priority to other lien claims. After testimony and hearing on these so-called wage claims, the district judge allowed each of the four members of the crew, as intervening libelants, the sum of $100 based on 46 U.S.C.A. § 594 as an analogous statute; and also allowed one member of the crew $50 for clothing left upon the ship and lost or not returned, and another $10 for similarly lost bedding.

The district judge did not make formal findings of fact, but in a brief opinion expressed the view that the crew had in effect been wrongfully discharged. The evidence in the record relating to the wage claims of the crew is in many respects vague and unsatisfactory but from it the district judge could have and apparently did find the following facts.

The ship libeled (named the St. Providenza II) was a motor vessel about 80 feet long, of 61 gross tons and 18 net tons, owned and operated by the master Philip Giammanco of Gloucester, Massachusetts. For several years prior to 1939 the vessel had been engaged in trawl fishing in the waters of the Atlantic, operating a part of each year out of Gloucester, and the remainder of the year out of Hampton, Virginia. A few days prior to March 29, 1939, the date on which the original libel in this case was filed, the vessel began a voyage from Hampton, Virginia, with a crew of seven men including the master, under an oral agreement whereby they were to work the vessel on what is called a "lay", the arrangement being in substance that the crew would furnish the food, ice and fuel and receive 60% of the gross proceeds of the catch, the ship owner to receive the remaining 40%. A few days thereafter, about 50 barrels of fish having been caught, the vessel developed engine trouble and was towed back to port. The fish caught were sold for about $200, which was less than the cost of the supplies furnished but not paid for by the crew, and later included among the libel claims against the ship. It was estimated that the

making of the repairs would occupy three days, and the master instructed the crew, who lived nearby, to go home and await orders to return for a continuation of the voyage. It appears he gave one or more of them a sufficient sum for transportation home. Before the repairs were made the original libel was filed, and shortly thereafter several members of the crew filed their intervening libels, each claiming about $1,000 by way of damages for breach of contract of employment for the fishing season. The evidence did not show with any definiteness what constituted such a season, but there was some testimony to the effect that on somewhat similar voyages, one or more members of the crew had averaged on a percentage basis about $100 a month. At the hearing held on April 21, 1939, some of the members of the crew testified in effect that as a result of the voyage having been broken up they would probably be unable to obtain further employment of the same kind during the summer. On June 6, 1939, the district judge filed a brief memorandum opinion in which he expressed the thought that the statute mentioned, 46 U.S.C.A. § 594, by analogy furnished "as fair a standard by which to adjudge the claims of the seamen in this case as can be found". His order filed July 7, 1939 decreed that four members of the crew were entitled to recover the respective allowances "as a first lien upon the proceeds of said sale". From this order the other lien claimants have appealed.

There is nothing novel or unusual of itself in the kind of an oral agreement that we have here between the owner of the vessel and the crew for their compensation on a fishing voyage. Such an arrangement has been common practice from ancient times, United States v. Laflin, 9 Cir., 24 F.2d 683; 56 C.J. 1058. In such situations the fishermen crew are treated as seamen, and there have been numerous judicial decisions enforcing the rights of the crew against the owner and the ship. The Carrier Dove, 1 Cir., 97 F. 111, 112; The Z. R.-3, D.C., 18 F.2d 122; The Flk, D.C. Mass., 1938 A.M.C. 714, 724; Robinson on Admiralty (1939) 281, 282. See also 46 U.S.C.A. §§ 531–534. In Benedict on Admiralty, 5th Ed. Vol. I, p. 129, the applicable law is briefly summarized as follows:

"In the earliest periods of maritime commerce, a common form of compensating the mariner was by giving him, in one way

or another, an interest in the success of the voyage. In modern times, fixed pecuniary wages have taken the place of a share of the earnings, except in the cases of whaling, fishing, and sealing voyages, in which the ancient mode of compensation still prevails. * * * Where a fishing vessel is worked on the quarter lay plan, her crew have a lien, as for wages, upon the vessel, and catch on board, for their share of the catch."

And in The Georgiana, 1 Cir., 245 F. 321, 325, the court said:

"For the value of their respective shares in the catch taken, upon a trip made upon terms like the above ["quarter lay plan"], the members of a fishing crew have a lien upon the vessel and the catch on board, corresponding to the lien of seamen shipped for hire in the ordinary way, for their unpaid wages against vessel, cargo and freight pending, so long as anything remains of either."

The novel feature of the present case lies in the asserted priority of lien claimed for fishermen as wages in lieu of prospective and speculative shares of fish not caught because the voyage was terminated by the libel of the ship for repairs and supplies. No case has been brought to our attention where a prior lien as for wages has been allowed under such circumstances; and we do not think it can be properly established consistently with other principles of admiralty law.

In Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12, 41 S.Ct. 1, 4, 65 L.Ed. 97, Mr. Justice Brandeis, speaking for the Court said:

"The maritime lien is a secret one. It may operate to the prejudice of prior mortgagees or purchasers without notice. It is therefore *stricti juris* and will not be extended by construction, analogy or inference."

In Collie v. Fergusson, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696, Mr. Justice Stone states the general admiralty rule that "events subsequent to the seizure do not give rise to liens against a vessel in *custodia legis*. See The Young America (D.C.) 30 F. 789, 790; The Nisseqogue (D.C.) 280 F. 174, 181; The Grapeshot (D.C.) 22 F. 123. Cf. New York Dock Co. v. The Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955." In Collie v. Fergusson, it

was held that seamen, employed at a stipulated monthly wage, some part of which had not been paid upon the libeling of the ship, were not entitled to recover double wages under the applicable statute for the delay in payment of wages consequent upon the seizure of the ship; and in The Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955, recovery of wharfage due under an agreement prior to the libel of the ship, accruing after her seizure, was disallowed, except as an expense of the libel proceeding.

In accordance with the general rule that maritime liens do not arise from matters happening subsequent to the legal seizure of the ship, it has uniformly been held (in the absence of an applicable statute or duly authorized continuing services of seamen) that no maritime lien can be allowed for wages to seamen accruing after the libeling of the ship. The Astoria, 5 Cir., 281 F. 618, 621; The Nisseqogue, D.C.N.C., 280 F. 174, 184; The Bethlehem, D.C.Pa., 286 F. 400, 402; The Philomena, D.C.Mass., 200 F. 873, 874; The Bethulia, D.C.Mass., 200 F. 876, 878; The Rupert City, D.C.Wash., 213 F. 263, 271; The Augustine Kobbe, D.C.Ala., 37 F. 696, 699; Id., C.C., 39 F. 559; The Irages, D.C., 283 F. 445. See also The Pacific Hemlock, D.C.Wash., 3 F.Supp. 305, 307, and Burdine v. Walden, 5 Cir., 91 F.2d 321. In Benedict on Admiralty, 5th Ed., § 585, the rule is stated that "seizure of a vessel under process, resulting in breaking up the voyage, operates as a discharge of the crew who, therefore, have no lien for further wages".

In the instant case it is clear that the crew had earned nothing from the catch up to the time of the seizure of the ship, and they performed no services thereafter, but apparently recognized the breaking up of the enterprise by the filing of their libel claims. See The Nisseqogue, supra; The Charles L. Baylis, D.C., 25 F. 862. Whether, if the fishing enterprise had not been broken up, they would subsequently have earned compensation for their share of the catch and if so the amount thereof, was wholly speculative, uncertain, and dependent upon future happenings. If they had been employed for a definite period at a definite wage they would not have been entitled to a prior lien for the wages accruing after the seizure of the ship even though the amount were certain.

*A fortiori* they were not entitled to a prior lien for compensation which might have been earned from a future catch wholly speculative in amount.

It is argued that when seamen are wrongfully discharged before normal expiration of their period of service they are entitled not only to the wages accrued up to the time of discharge, but also to damages for the wrongful discharge; and as they admittedly have a prior maritime lien for the wages actually earned, they should also have a lien for damages. While there are situations in which such damages have been allowed as a lien (The Wanderer. C.C. 20 F. 655; The Lakeport, D.C., 15 F.2d 575), the admiralty law does not allow a prior lien for damages consequential upon a legal arrest of a vessel, as we have above noted. Furthermore, even if the lien for damages could be admitted in the case of ordinary wages, it is clear, upon well established legal principles as to computation of damages, the amount is entirely too speculative in this case to be allowed. In Williams v. The Sylph, 1841, 29 F.Cas. page 1407, No. 17,740 it was pointed out that

"The present case is distinguishable from that of an ordinary hiring in this great particular: that the libelants, shipping for shares, have no specific lien on the vessel until the earnings of the vessel are ascertained and liquidated."

It is also suggested that it is only equitable to allow the seamen some damages here because the other lien claimants must have been guilty of laches in not more promptly enforcing their liens, but we find nothing in the record before us to support this contention; and it appears that one of the other lien claims filed is for supplies furnished for the particular voyage.

The intervening libels filed by the members of the crew each claimed from $900 to $1100 as their estimated shares of what might have been the future catch; but the district judge evidently concluded that no such allowance could be made because wholly speculative. In allowing four members of the crew each the sum of $100 he, by analogy, applied the statute (46 U.S.C.A. § 594) which provides that—

"Any seaman who has signed an agreement and is afterward discharged before the commencement of the voyage or before one month's wages are earned, without fault on his part justifying such discharge, and without his consent, shall be entitled to receive from the master or owner, in addition to any wages he may have earned, a sum equal in amount to one month's wages as compensation, and may, on adducing evidence satisfactory to the court hearing the case, of having been improperly discharged, recover such compensation as if it were wages duly earned."

But we do not think the allowances can be supported on the analogy of this statute. As the agreement here was oral and not written it is obvious that the statute is not literally applicable to the case. More importantly it is to be noted that it was codified from R.S. § 4527, which was derived from the Act of June 7, 1872, c. 322, § 21, 17 Stat. 266; and by the Act of June 9, 1874, c. 260, 18 Stat. 64, (now codified as 46 U.S.C.A. § 544) section 594 was expressly made inapplicable "in any case where the seamen are by custom or agreement entitled to participate in the profits or result of a cruise, or voyage". Ross v. Bourne, D.C.Mass., 1883, 14 F. 858, 859, affirmed C.C., 17 F. 703; United States v. Bain, C.C.Me., 1880, 5 F. 192; Wilson v. Manhattan Canning Co., D.C., 205 F. 996. It also seems that the word "seaman" in 46 U.S.C.A. § 594, was not intended by Congress to include a fisherman "on a lay". See The Cornelia M. Kingsland, D.C., 25 F. 856; Telles v. Lynde, D.C., 47 F. 912. Compare Blackton v. Gordon, 303 U.S. 91, 92, 94, 58 S.Ct. 417, 82 L.Ed. 683; Collie v. Fergusson, 281 U.S. 52, 57, 50 S.Ct. 189, 74 L.Ed. 696.

The appellees place reliance on the early cases of The Page, 1878, 18 Fed.Cas. page 977, No. 10,660 and Woolf v. The Oder, 1802, 30 Fed.Cas. page 600, No. 18,027; but they do not support the contention here made. The Page dealt with the case of a fishing "lay" where the crew were allowed in addition to their proportionate share of the fish actually caught, a further sum estimated as the amount they would have received from an additional catch (proportionate to the actual catch) if the voyage had not been prematurely terminated by the fault of the master who had neglected to provide sufficient salt. The case is not in point here because the voyage was voluntarily terminated by the master before its normal expiration and not, as in this case, terminated by the attachment of the vessel. In Woolf v. The Oder a fishing lay was not involved but only ordinary wages; and

the case merely illustrates a well known early maritime practice by which seamen discharged without their fault, by the breaking up of the voyage at a place far distant from the port of shipment, by libel of the ship or otherwise, were allowed in addition to their accrued wages for services actually performed, a further sum, discretionary in amount but estimated to be sufficient to defray the expenses of their return to the place from where they shipped. Other cases illustrative of the same practice are Thompson v. The Oakland, 1841, 23 Fed.Cas. page 1064, No. 13,971; The Frank & Willie, D.C., 45 F. 488, 490; Alaska SS. Co. v. Gilbert, 9 Cir., 236 F. 715; and The Trader, D.C.S.C., 17 F.2d 623, 626. See also The Steel Trader, 275 U.S. 388, 392, 48 S.Ct. 162, 72 L.Ed. 326. It seems probable that this early maritime practice may have influenced the passage by Congress of the Act of December 21, 1898, c. 28, § 3, 30 Stat. 755; R.S. § 4526, now codified in 46 U.S.C.A. § 593, which, as amended March 5, 1934, c. 40, 48 Stat. 395, was made applicable to fishing and whaling vessels but not to yachts; and as amended now reads as follows:

"In cases where the service of any seaman terminates before the period contemplated in the agreement, by reason of the loss or wreck of the vessel, such seaman shall be entitled to wages for the time of service prior to such termination, but not for any further period. Such seaman shall be considered as a destitute seaman and shall be treated and transported to port of shipment as provided in sections 678, 679, and 681. This section shall apply to fishing and whaling vessels but not to yachts."

It will be noted that the statute literally applies only where the services of the seaman are terminated, "by reason of loss or wreck of the vessel"; and allows wages only for the time of service prior to the termination of the voyage. It is not necessary to now decide whether the statute supersedes or merely supplements the particular maritime practice referred to as neither supports the position here taken for the appellees.

We conclude therefore that the award of $100 to each of the appellees in this case for wages as a first or other lien on the proceeds of the sale of the vessel must be disallowed and the order appealed from must be modified in this respect. The question as to whether the appellees have a just claim against the owner of the vessel in personam is not presented on this appeal.

As to the allowance of $50 and $10 respectively to two members of the crew for loss of clothing and bedding, the evidence is meagre indeed. It appears, however, that this personal property was left upon the vessel when the owners left it expecting to return to complete the voyage, and was not thereafter recovered by them. In the absence of any evidence to explain the loss we think the allowance should not be disturbed. The Washington, D.C.N.Y., 296 F. 158, 166.

Modified.

PARKER, Circuit Judge (dissenting).

There can be no question but that a sharesman under a fishing lay is entitled to the usual maritime lien for seamen's wages upon the ship, as well as upon the catch or cargo. 56 C.J. 1065 and cases cited. The seizure of the vessel resulting in a breaking up of the voyage entitles him to any amount previously earned and to damages due to the discharge. The case is not different from any other case of discharge resulting from seizure of the vessel and consequent breaking up of the voyage, as to which see 56 C.J. 968; The Hudson, 12 Fed.Cas. page 805, No. 6,831; Van Beuren v. Wilson, 9 Cow., N.Y., 158, 18 Am.Dec. 491. In such case, wages accruing after the seizure do not constitute a lien on the vessel, but lien is accorded for wages earned prior thereto and damages resulting from the discharge. As said by Judge Pardee in The Esteban de Antunano, C.C., 31 F. 920, 925: "It is probable that the breaking up of the voyage by the seizure of the ship operated, ipso facto, a discharge of the crew (see Woolf v. The Oder [Fed.Cas. No. 18,027], 2 Pet.Adm. 261;), and if the crew thereafter remained aboard, they did it by the consent of the sheriff. In such case they would, no doubt, be entitled to their pay, and damages resulting from discharge, and the same would constitute an admiralty lien, not divested by the seizure and sale of the ship."

No distinction can properly be drawn, with respect to the right of lien, between claim for wages earned under a contract and claim for damages arising from discharge in violation of its terms. The lien

708

for wages covers the entire term of employment contracted for. 56 C.J. 1053; The Wanderer, C.C., 20 F. 655. And certainly the seaman's rights thereunder may not be defeated without fault on his part. He cannot, of course, be accorded lien for wages accruing subsequent to seizure for the reason that lien may not be created on the vessel after it has passed out of the control of the owners; but this does not mean that he may not have a lien for the damages resulting from the breach of his contract occasioned by the seizure.* Woolf v. The Oder, 30 Fed.Cas. page 600, No. 18,027. This is to award against the vessel no more than the seaman is entitled to under his contract at the time the seizure is made. The statute awarding one month's wages as damages in case of wrongful discharge, which has no application to a case such as this, is intended merely to afford seamen a simple and summary method of establishing and enforcing damages. 56 C.J. 1028; The Steel Trader, 275 U.S. 388, 390, 48 S.Ct. 162, 72 L.Ed. 326. But there can be no question that, in cases where the statute does not apply, a maritime lien exists on the vessel for the amount necessary to compensate the seaman for the breach of his contract of employment. The Lakeport, D.C., 15 F.2d 575.

In a case such as that with which we are dealing, damages resulting from discharge are difficult to estimate, but one month's earnings based on prior experience, the basis adopted by the Judge below, is certainly not unreasonable.

I see no injustice whatever in giving these seamen priority for the damage resulting from their discharge over bills of repairmen, who, when they permitted the vessel to proceed about her business, must have known that contracts of the character here involved would be made with the crew. When breach of these contracts was caused by seizure of the vessel at the instance of the repairmen, it is but fair that claims for damage resulting from such breach be given priority over their claims.

I think, therefore, that the decree appealed from should be affirmed.

* For cases relating to lien for damages for breach of contract of employment as distinguished from wages, see Dary v. The Caroline Miller, D.C., 36 F. 507; The Abbie M. Deering, D.C.,

105 F. 400; The White Seal, 9 Cir., 194 F. 402; The Emma F. Angell, D.C., 217 F. 311; The City of New Orleans, C.C., 33 F. 683.