ticular tracts of the mortgaged premises. The bill charges that Dickerson had no title to the lands mentioned in said mortgage, or if any, only to a small part of very little value; and that Lloyd & Sparks, when they executed the assignment, were well acquainted with that circumstance, but concealed it from Smith, who supposed the title to be good. That before either of the bonds assigned to Smith became due, Smith died, leaving Johnson his surviving partner. In January, 1799, Johnson became bankrupt, and the plaintiffs were regularly appointed his assignees in England. That about the close of the year 1797, Dickerson became insolvent, which Lloyd & Sparks well knew, and in 1798, he was regularly declared a bankrupt under the laws of the United States; and that his estate will not pay the expenses of the commission. In November, 1798, Lloyd died, leaving the defendants, (except Sparks,) his executors and devisees. That Sparks has become insolvent, and unable to pay the complainants' demand. The prayer is, that the executors and devisees of Lloyd, may be decreed to pay, and for general relief. Sparks demurs, and assigns for cause, that the bill does not show a title in the complainants under Smith, to the said mortgage, premises, and bonds.

## Case No. 10,660.

The PAGE.

[5 Sawy. 299.] [1]

District Court, D. California. Nov. 6, 1878.

SEAMEN—FISHING VOYAGE—IMPROPER EQUIPMENT—NEGLIGENCE OF MASTER—PAY FOR CATCH.

Where the master of a vessel engaged in a fishing adventure negligently omitted to procure salt, in consequence of which the voyage was terminated twenty-five days before the close of the season, *held*, that the men were entitled to compensation, and for this purpose were to be credited for the twenty-five days lost, with the same number of fish as they had caught for the twenty days preceding the breaking up of the voyage.

In admiralty.

D. T. Sullivan, for libellants.

J. T. Hoyt, for claimant.

HOFFMAN, District Judge. The articles for the voyage in question in this case have been drawn by the owner and signed by the men with very reprehensible carelessness. That they do not express the contract actually made with the seamen is admitted on both sides. They provide merely that the men shall be paid at the rate of twenty-five dollars per thousand for the fish caught by each of them respectively. The men contend that it was also agreed that they should receive twenty-five dollars per month as wages from the time of leaving this port until, as some say, their arrival at the fishing grounds; according to others, until the vessel reached Petropoloski; and according to others, until the cargo was discharged at that port. On the part of the claimant it is contended that the agreement was, that inasmuch as the vessel was to proceed beyond the fishing grounds to Petropoloski, there deliver her cargo, and return to the fishing grounds, the men were to receive twenty-five dollars per month for the time consumed in this deviation, which was to be made solely in the interest of the owner. I have come to the conclusion that this was certainly the contract intended to be made by the owner, and most probably so understood by the seamen—if not, the misconception was caused by their own carelessness. There is no proof whatever of any attempt to deceive the men. They are more intelligent than the majority of persons of their calling. They had an ample opportunity to read the articles before signing, and one of them admits hearing the owner ask the master if he had explained to the men "about the latitude"; an inquiry, the mean-

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

ing of which he did not understand at the time, but took no pains to ascertain. The owner testifies that latitude 51° north was fixed upon as the point where the wages were to begin, and they were to continue until that latitude was reached on the vessel's return from Petropoloski. He also states that he directed the master to explain this to the men, and that he himself explained it to them or some of them. In this he is corroborated by the testimony of a disinterested witness, who happened to be present.

But the most important corroboration, and that by which I am chiefly influenced, is that afforded by the intrinsic probability of the case. Fishing voyages from this port to the northern seas seem to present peculiar attractions for seamen. The number of the crew permits the formation of three watches, instead of two, as is usual. The men have thus eight hours off to four hours on. They live in the cabin, on the same fare as that of the officers, and necessarily on terms of much greater familiarity and equality than are ordinarily allowed. Their labor is to some extent voluntary, for they work for themselves as well as for the vessel; and their remuneration depends on their skill, their industry and their success. The terms of their engagement seem to be generally understood, and substantially the same in all enterprises of this description undertaken from this port. The men receive twenty-five dollars per thousand for the fish caught by them respectively. No wages are allowed for the voyage to or from the fishing ground. If the voyage be successful, the remuneration of the men, if they are diligent and skillful, will equal, and in many instances exceed, what they could earn as wages for a voyage of equal length.

In this case the vessel was not to proceed directly to the fishing grounds, but was to pass by them, go to Petropoloski, discharge a cargo, and then return to commence fishing. It was, therefore, just that for the time consumed in making this deviation the men should receive wages; and this is what the owner testifies was agreed upon. It seems in the highest degree improbable that he should have consented, or that the men should have supposed, that they were to be on wages from the moment of quitting this port until their arrival at Petropoloski, or at the fishing grounds—a stipulation which would, so far as appears, have been wholly without precedent in the fishing adventures from this port.

It is also urged, on the part of the libellants, that the voyage was abandoned by the master before the expiration of the fishing season, and they were thus deprived of the opportunity of making the full catch, upon which their compensation depended. It is not denied that the voyage was terminated before the close of the season. The master alleges that he did so in the interest of the owners, because of the inability of the men

to catch fish. The men allege that the fishing was abandoned because the vessel had no salt with which to cure the fish. The evidence clearly points to the existence of some undeniable facts.

1. When the master determined to break up the voyage the supply of salt was exhausted. Shortly after the arrival of the schooner at the fishing grounds she encountered the bark Constitution, belonging to the same owner, the master of which, in pursuance of previous instructions by the owner, offered to give to the master of the Page as many fish as he chose to take, or supply him with as much salt as he required. Captain Morrissey decided to take fish, and he was accordingly supplied with about thirty thousand. These seem to have required additional salt, and the Page's stores were drawn on for the purpose; the quantity so consumed seems, however, to have been replaced by the Constitution. This occurrence took place about the 8th of July. The Page continued her fishing operations until the 31st, at which time her salt was wholly exhausted. The supply on board the Constitution was amply sufficient for both vessels, but it was stowed in the hold underneath the fish, and was at that time inaccessible. There is some conflict of testimony as to whether the master of the Page actually requested a supply of salt and was refused—but I think it established by the proofs that he could not have obtained it if he had desired. The vessel was thus compelled to relinquish the enterprise, and her liability to the men for so doing depends upon whether the master was in fault in not obtaining salt from the Constitution on the 8th, or subsequently, during the time that this latter vessel was willing and able to deliver it; by omitting to do so he virtually put it out of his own power to complete his catch, and thus deprived his crew of the opportunity of earning their compensation.

2. It clearly appears that the crew was very incompetent. The number of fish caught by them during the time that their operations continued, contrasts most unfavorably with the number per capita taken by the crew of the Constitution. Whether this was owing to their negligence or their want of skill does not clearly appear; it was probably due to both. Their conduct at Petropoloski, and especially their attempt to distort the considerate action of the master relative to some bear skins into a grievance, present them in no favorable light to the consideration of the court.

But I am nevertheless unable to justify the master in virtually defeating the enterprise by omitting to provide himself with salt, so soon after the vessel's arrival at the fishing grounds, and before the inefficiency or unskillfulness of the men had been fully demonstrated.

It does not appear that they represented themselves as skillful or experienced fishermen. It was the duty of the master to ascer-

tain what were the qualifications of the persons upon whose exertions the success of the adventure depended. If, without fraud on their part, their qualifications for the service proved to be less than the master expected, he had, on that account, no right to break up the adventure, and deprive them of the opportunity of earning what they could.

It may be urged that as it was the vessel's interest, and the chief object of the voyage, to catch as many fish as possible, the fact that the master relinquished the enterprise should be taken as proof that its further prosecution with the crew under his command would be a useless waste of time and money. But it is to be recollected that the vessel had already received from the Constitution nearly half a cargo of fish, on which the men were not entitled to any lay. She had also made a freighting voyage to Petropoloski, and back to the fishing grounds, for which the men were to receive no wages except for the period of eighteen days. She had thus carried out a cargo of freight, and was about to carry back half a cargo of fish, without any expense for seamen's wages, except for the period of eighteen days just mentioned. It may be, therefore, that under these circumstances the master relinquished the further prosecution of an enterprise which, if its whole profits to the ship had depended on the catch by the men, he would have continued.

Testimony was offered to show that the men assented to the abandonment of the voyage. This is strenuously denied by them, and the evidence in support of the assertion is inconclusive and unsatisfactory.

On the whole, I incline to the conclusion that the master had no right, under the circumstances, to abandon the voyage, and that the men are entitled to damages for his doing so. On the other hand, there can be no doubt that the men were very deficient in skill or diligence, or in both. They have no claim to any peculiarly favorable consideration by the court, and their recovery should be restricted to what they probably would have earned had the enterprise been prosecuted up to the time when it might have been reasonably and properly brought to a conclusion. Their claim to be paid as if the vessel had obtained by their exertions a full cargo of fish I reject as founded upon an hypothesis which would not have been in fact realized. The fishing season seems ordinarily to last until towards the end of August, or the beginning of September. If the master had remained until the 25th August, I think he would have afforded all the opportunity to fish to which the men were entitled, unless there had been a signal improvement in their efficiency, which there is no reason to suppose would have occurred.

I shall, therefore, allow to each of the libellants the damages he may be presumed to have sustained by reason of being deprived of the opportunity to fish for a period of twenty-five days. The number of fish that he might or would have taken during that time to be ascertained by computing his average catch per diem for the twenty-five days preceding the actual termination of the fishing, and allowing him a similar catch for the succeeding twenty-five days. Upon the catch of each man, as thus ascertained, he is to be allowed twenty-five dollars per thousand. For these amounts, together with balances admitted to be due the men on a settlement of their accounts, a decree will be entered.

A reference will be had to the commissioner to ascertain and report the total amount due each of the libellants respectively, unless the parties can agree upon the computation on the basis laid down in this opinion.