**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

YARMOUTH SEA PRODUCTS LIMITED, a
Canadian Corporation,
Plaintiff-Appellee,

v.

DAVID SCULLY, Charterer, In
Personam,
Defendant-Appellant,

and

No. 96-1209

S/V COYOTE, her engines, boilers,
tackle, furniture, equipment,
freights, and apparel, In Rem;
HELEN DAVIS, Owner; THE BOC
GROUP INCORPORATED; INTERNATIONAL
BUSINESS MACHINES CORPORATION,
a/k/a IBM,
Defendants.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Solomon Blatt, Jr., Senior District Judge.
(CA-94-2496-2-8)

Argued: December 2, 1996

Decided: December 2, 1997

Before WILKINSON, Chief Judge, ERVIN, Circuit Judge, and
DAVIS, United States District Judge for the District of Maryland,
sitting by designation.

_____

Affirmed in part and vacated and remanded in part by published opinion. Judge Davis wrote the opinion, in which Chief Judge Wilkinson and Judge Ervin joined.

_____

**COUNSEL**

**ARGUED:** Robert Bert Ransom, Andrew Kenneth Epting, Jr., Charleston, South Carolina, for Appellant. John Hughes Cooper, JOHN HUGHES COOPER, P.C., Sullivan's Island, South Carolina, for Appellee. **ON BRIEF:** John B. Kern, Charleston, South Carolina, for Appellee.

_____

**OPINION**

DAVIS, District Judge:

This admiralty case began when plaintiff-appellee Yarmouth Sea Products, Ltd. ("Yarmouth") sued defendant-appellant David Scully ("Scully"), charterer of the sailing vessel COYOTE, and others, for damages arising from the collision at sea of the COYOTE with its fishing vessel, the LADY OLIVE MARIE. The district court exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1333. At the conclusion of a short bench trial, the court rendered findings of fact and conclusions of law and entered judgment for $78,616.81 in favor of Yarmouth. Scully has appealed, asserting one ground for outright reversal of the judgment, and also mounting several challenges to the district court's damage award. For the reasons set forth below, we affirm the judgment insofar as it imposed 100% of the fault for the collision upon Scully. Furthermore, although we conclude that the district court committed no reversible error in connection with its identification of the proper elements of damages in a case such as this one, we vacate and remand for further consideration the court's assessment of damages for one of those damage elements.

I

At approximately 4:30 a.m. on August 24, 1994, some 130 miles from Yarmouth, Nova Scotia, Canada near the Georges Bank, the

2

60-foot racing sailboat COYOTE collided with the port side of the 65-foot fishing boat LADY OLIVE MARIE. When the two craft collided, the COYOTE was sailing downwind at 5 to 8 knots, while the LADY OLIVE MARIE was drifting at 1 to 1.5 knots with her engines in neutral. The wind was from the northeast at 25 to 35 knots with seas of 10 to 15 feet. The night was clear with stars visible in the sky.

At the time of the collision, Scully was sailing the COYOTE alone, an activity known as "single handed sailing," as part of his 2,000 mile qualifying voyage from Horta, Azores to Newport, Rhode Island in order to be eligible to compete in a sailboat race known as the "BOC Challenge Around Alone 1994-95." Yarmouth, a Canadian wholesale fish broker, owned a fleet of sword fishing vessels which included the LADY OLIVE MARIE. On this particular ill-fated voyage, the LADY OLIVE MARIE's captain and six-member crew were working the vessel on a lay share agreement with Yarmouth.

Under the terms of Yarmouth's lay share agreement with the captain and crew members of the LADY OLIVE MARIE, Yarmouth would provide the vessel and the ice for the trip in return for 40% of the boat price of the catch, after being reimbursed by the crew for fuel, bait and groceries. The crew, on the other hand, would fish the vessel for 60% of the boat price of the catch, less the cost of the fuel, bait and groceries. Yarmouth would also pay the captain an additional 5% fee as compensation for his additional responsibilities. Moreover, when the catch was landed, Yarmouth would credit the crew's accounts with their portion of the net dock value of the catch and hold it for resale by its brokerage division. Accordingly, Yarmouth would hold the crew's lay shares in trust and pay them from the proceeds of the sale of fish.

When the collision occurred, the crew of the LADY OLIVE MARIE were waiting for dawn and subsiding weather to begin fishing. Gordon Gray ("Gray") was on watch, which consisted of monitoring the radars and keeping a lookout from the wheelhouse. Gray testified at trial that he never observed the COYOTE visually or on radar prior to the collision. At the time of the casualty, Scully was stationed in the COYOTE's cockpit. He conceded at trial that he did not see the LADY OLIVE MARIE until after the collision, and that it was possible that he dozed off while in the cockpit, testifying as follows:

3

> [T]here is nothing in particular to occupy your mind. So one does tend to drift in and out of sort of a -- of a light sleep . . . . I was not obviously as alert that[sic] I could have been. If I had been on full alert, then this collision would never have happened. I would have seen the LADY OLIVE MARIE and been able to steer clear of her.

J.A. at 195.

The LADY OLIVE MARIE was equipped with two properly operating radars, although sea clutter obscured targets within a range of 2 to 2.5 miles at the time of the collision. The boat was also equipped with VHF and SSB marine radios, which were operating properly. The LADY OLIVE MARIE also displayed properly illuminated navigation and fishing lights. The COYOTE, on the other hand, was equipped with one radar, which was not operational due to the failure of the COYOTE's electrical generator and an effort by Scully to conserve battery power. In addition, neither of the yacht's two VHF radios were in operation. Moreover, the COYOTE's mast top navigation lights were not functioning.[1]

When the vessels collided, the bowsprit of the COYOTE punctured the wooden hull of the LADY OLIVE MARIE. The wind blew the stern of the COYOTE around bringing the vessels port to port and causing a line from the COYOTE to become fouled in a part of the LADY OLIVE MARIE's railing. Shortly thereafter, the LADY OLIVE MARIE's railing broke loose and the boats separated. After the vessels parted, however, Scully failed, inexplicably, to identify himself to the crew of the LADY OLIVE MARIE or ascertain whether they had sustained any damage. Indeed, the LADY OLIVE MARIE quickly lost sight of the COYOTE. The Captain of the LADY OLIVE MARIE, David Belliveau ("Captain Belliveau"), looked for the COYOTE but saw only the lights of two fishing vessels

_____

[1] Because his navigation lights were not functioning and because he knew he was entering an area frequented by fishing boats, Scully rigged emergency flashlights powered by D-cell batteries to serve as stern and bow lights on the COYOTE approximately 8-1/2 hours before the collision occurred. The district court found, however, that these lights were not illuminated just before and at the time of the casualty.

4

in the vicinity, the ANGELA ROSE and the ENDURANCE, both more than five miles away. Captain Belliveau repeatedly called for the COYOTE on VHF radio, but received no reply. He then monitored his two radars, but was unable to detect any sign of the sailboat, although the other fishing boats were visible on radar.[2] Except for sea clutter within about two miles, the radars on the LADY OLIVE MARIE detected buoys and other vessels without apparent problem both before and after the collision. The LADY OLIVE MARIE's radars did not detect the COYOTE before the collision, however.

Not long after the casualty, the fish hold of the LADY OLIVE MARIE began filling up with water. The United States Coast Guard and the Canadian Coast Guard rendered assistance and eventually brought the flooding under control. Due to extensive water damage, however, the LADY OLIVE MARIE was forced to return to port for repairs, resulting in an abandonment of the fishing voyage. Therefore, Yarmouth filed suit against several parties, all of whom, except Scully, were dismissed from the case prior to final judgment.

After a two-day bench trial, the district court found Scully to be 100% at fault in the collision on the grounds that, as discussed below, his failure to maintain a proper lookout by sight, hearing or radar, and to display navigation lights while the COYOTE was underway, was the sole proximate cause of the incident. Accordingly, the court awarded Yarmouth damages of $78,616.81 for lost catch, loss of supplies, loss of brokerage, hull damage and pre-judgment interest. The district court expressly apportioned damages as follows:

> $38,707.98   Crew's lost profit with interest
>
> $ 3,225.67   Captain's fee with interest
>
> $23,571.16   Yarmouth's lost profit with interest
>
> $ 5,425.19   Yarmouth's loss of brokerage

_____

[2] Captain Belliveau also contacted the ANGELA ROSE and the ENDURANCE and requested that they search for the COYOTE on radar. Sometime later, the crew of the ENDURANCE informed Captain Belliveau by radio that for a few seconds they had detected a faint target which could have been the COYOTE, but that they had been unable to find the target again.

$ 4,825.97    Hull damage

$ 2,860.84    Food, fuel, bait and groceries
_____

$78,616.81    TOTAL

J.A. 49-50. This appeal followed.

II

A district court's findings of fact are reviewed under the clearly erroneous standard. Fed. R. Civ. P. 52(a). Watson v. Lowcountry Red Cross, 974 F.2d 482, 485 (4th Cir. 1992); see also Norfolk Shipbuilding & Dry Dock Corp. v. M/Y La Belle Simone, 537 F.2d 1201, 1203 (4th Cir. 1976). Under the clearly erroneous standard of review, an appellate court must accept the lower court's findings of fact unless upon review the appellate court "`is left with the definite and firm conviction that a mistake has been committed.'" Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Questions of law are reviewed de novo . Watson, 974 F.2d at 485; United Food & Commercial Workers v. Marval Poultry Co., 876 F.2d 346, 351 (4th Cir. 1989).

III

Scully contends first that the district court's liability determination requires reversal of the judgment. He further contends that the district court awarded damages which, as a matter of law, are not recoverable in a claim arising from a maritime collision. Finally, he contends that there was insufficient evidence of certain damages, and that pre-judgment interest was erroneously allowed. We address these issues in turn.

A

A venerable rule of admiralty jurisprudence is embodied in the presumption of The OREGON, 158 U.S. 186 (1895), namely, that a moving vessel is presumed to be at fault in a collision with a stationary visible object. Scully argues that the district court improperly based

6

its apportionment of fault on this presumption of negligence. According to Scully, the district court found that the COYOTE was a moving vessel which collided with a stationary visible object, and consequently required him to show by clear and convincing evidence that his conduct could not have contributed to the accident. Scully argues vigorously that this was error. He maintains that because the LADY OLIVE MARIE was <u>adrift</u> and not stationary, the presumption was not applicable, and he should not have had the heightened burden of proof thrust upon him.

We agree with Scully that the LADY OLIVE MARIE was not <u>stationary</u> within the meaning of the relevant statutory provision, and that the presumption of fault was not applicable. **3** Rather, the record reveals that the LADY OLIVE MARIE met the statutory definition of a power driven vessel "underway" in that it was not "at anchor, or made fast to the shore, or aground." Rule 3(i) of International Regulations for Preventing Collisions at Sea, 1972, 33 U.S.C. § 1602, 33 foll. 1602 (COLREGS, Rule 3(i)). Thus, the arguably relevant statutory standard was COLREGS, Rule 18(a)(iv), which provides in pertinent part that "[a] power driven vessel underway shall keep out of the way of . . . [a] sailing vessel." Accordingly, if we were persuaded that the district court's liability determination rested, in whole or in substantial part, upon an erroneous application of the presumption of <u>The OREGON</u>, that a moving vessel is presumed to be at fault in a collision with a stationary visible object, we would be constrained to reverse the judgment.

We conclude, however, that such a crabbed interpretation of the district court's findings and conclusions would be unwarranted. Although the district court mentioned the presumption of <u>The</u>

_____

**3** There was undisputed evidence that the LADY OLIVE MARIE was "stopped," J.A. at 44, but as we note in text, the relevant rules of the road in the maritime context require that the vessel be "stationary" as that word is defined. Although the district judge intimated, with considerable common sense, that "for all practical purposes" a vessel that is "stopped" is essentially "stationary," <u>see</u> J.A. at 318-19, the court also reiterated, in denying Scully's motion to revise judgment, that "THE FACT THAT SHE WAS OR WAS NOT ANCHORED [sic], WAS NOT A PROXIMATE CAUSE OF THIS COLLISION." <u>Id.</u> at 319.

OREGON rather prominently in a contextual sense, it was in truth mentioned only in passing, J.A. at 51, and a fair reading of the court's findings and conclusions makes it plain that the court did not rely on that presumption in its liability determination. Rather, it is clear that the court's determination of fault was based on a consideration of all "the circumstances," J.A. at 47, and specifically centered on its finding and conclusion that "Scully failed to maintain a proper lookout before and at the time of the collision," id. at 51; see also id. at 45, in violation of COLREGS, Rule 5, which states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." The court's finding and related legal conclusion was emphatic and could not have been more plain: "[A]ll credible evidence is that Scully failed to keep a look-out and that Scully's failure to keep a look-out was the sole proximate cause of the collision. Scully cannot avoid liability for this fault." J.A. at 52 (emphasis added). Moreover, the district court bolstered this finding by its specific finding that the COYOTE was essentially invisible to the LADY OLIVE MARIE. Id.

It follows from the above that Scully's contention, based on COLREGS, Rule 18(a)(iv), that the burden of proof should have been upon the LADY OLIVE MARIE rather than the COYOTE, is misplaced. As Yarmouth contends, COLREGS, Rule 18(a)(iv) is part of a statutory section that applies only to "vessels in sight of one another." Under COLREGS, Rule 3(k), "[v]essels shall be deemed to be in sight of one another only when one can be observed visually from the other." (emphasis added). See COLREGS, Rule 11 et seq. As such, COLREGS, Rule 18(a)(iv) is inapplicable in the instant case; the district court specifically found that the vessels were not in sight of one another when it stated that "a contributing cause of the collision was the failure of Scully to display navigation lights while COYOTE was underway, which prevented the look-out on LADY OLIVE MARIE from visually observing COYOTE in time to avoid collision." J.A. at 52 (emphasis added). In other words, although LADY OLIVE MARIE was "in sight" of COYOTE, the latter was not "in sight" of the former.

Thus, a ground for the assignment of fault having been established on the basis of substantial evidence, the court proceeded to apply the

8

rule of The PENNSYLVANIA, 86 U.S. 125 (1873), which requires that a vessel which violates a statutory duty of the road prove that the violation could not have contributed to the collision to avoid liability. Id. at 136. The burden of proof as to this issue is clear and convincing evidence. Churchill v. F/V Fjord, 857 F.2d 571, 577 (9th Cir. 1988). In sum, because the district court's findings as to breach of duty and causation are not clearly erroneous, we have no occasion to disturb its findings and conclusions as to liability for the collision.

B

Scully also contends that the district court erred in its determinations as to the proper elements and amounts of damages. With one exception, as discussed below, we reject those challenges.

(i)

As an initial matter, Scully contends that Yarmouth's claim for lost catch is simply too speculative to support an award of damages as a matter of law. As primary support for this position, Scully cites Old Point Fish Company, Inc. v. Haywood, 109 F.2d 703 (4th Cir. 1940). He asserts that Old Point stands for the broad proposition that prospective profits from a fishing lay are "`too speculative and uncertain to be a proper measure of damages.'" Appellant's Brief at 16 (quoting Putnam v. Lower, 236 F.2d 561 (9th Cir. 1956)).

Old Point, however, is distinguishable from the case at bar. In Old Point, a fishing vessel was forced to return to port for repairs, thereby prematurely terminating a fishing voyage. While in port, prior lienholders asserted claims against the vessel. Thereafter, four members of the boat's crew who were working on the basis of a lay share arrangement filed intervening liens for an estimated percentage of the profit that was to have resulted from the vessel's catch. 109 F.2d at 704-05. Essentially then, Old Point is a maritime lien case, unlike the case sub judice.

The Old Point court took pains to emphasize that the novel feature of the case was the "asserted priority of lien claimed for fishermen as wages. . . ." Id. at 705. The court held that because the amount of the

9

catch was "uncertain and dependent upon future happenings," the fishermen "were not entitled to a prior lien for compensation which might have been earned from a future catch wholly speculative in amount."**4** Id. at 705-06. The court also held that a maritime lien cannot arise against a vessel in custodia legis and that admiralty does not allow a prior lien for damages consequential upon the arrest of a vessel. Id. Thus, the court's holding is limited to the maritime lien context. Accordingly, Old Point does not instruct, as Scully suggests, that damages for a lost fishing voyage are, as a matter of law, too speculative to be recoverable.

Moreover, Scully's reliance on Putnam v. Lower , 236 F.2d 561 (9th Cir. 1956), for the same proposition is similarly misplaced. Putnam also involved fishermen on a lay share seeking a maritime lien for lost profits because of the unexpected termination of a tuna fishing venture. Id. at 563-66. The court held that while the fishermen were entitled to receive all amounts expended in preparation for the venture, as well as compensation for the time and services spent sailing the boat, prospective profits were too speculative to be recoverable. Id. at 573.

The possibility of prevailing on a claim for lost profits from a fishing voyage has long been contemplated by the Supreme Court as evidenced by The CONQUEROR, 166 U.S. 110 (1897). In that case, the Court stated:

> That the loss of profits or the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, and commonly spoken of as "demurrage" is a proper element of damage, is too well settled both in England and America to be open to question. It is equally well settled, however, that demurrage will only be allowed when profits have actually been, or may reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty .... It does not follow, as

_____

**4** The court also cites, interalia, Williams v. The Sylph, 29 F.Cas. 1407 (S. D. N.Y. 1841), as support for this conclusion. Williams also involved seamen on a share plan seeking a maritime lien for lost profits resulting from an aborted voyage. Id. at 1407-08.

10

a matter of necessity that anything is due for the detention of a vessel while under repair. Under some circumstances, undoubtedly, such a con-sequence will follow, as, for example, where a fishing voyage is lost, or where the vessel would have been beneficially employed.

Id. at 125 (emphasis added). Thus, the key to recovery in such cases is the ability to prove loss of profits "with reasonable certainty." See, e.g., Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1155 (5th Cir. 1990) ("The district court's methodology permitted it to arrive at ... damages with `reasonable certainty'"); Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 822 (11th Cir.) ("The district court properly required the plaintiffs to prove their loss `with reasonable certainty' before allowing recovery."), reh'g denied, 738 F.2d 451 (1984); Moore-McCormack Lines, Inc. v. The Esso Camden, 244 F.2d 198, 201 (2d Cir.) ("It is well established that demurrage is recoverable only when profits have been, or may be reasonably supposed to have been lost, and such profits can be proven with reasonable certainty."), cert. denied, 355 U.S. 822 (1957). While what constitutes "reasonable certainty" is of necessity a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be determined on a case-by-case basis, it has been said that this process usually involves "a showing in commercial cases that the vessel `has been engaged, or was capable of being engaged in a profitable commerce. . . .'" Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 747 F.2d 995, 1001 (5th Cir. 1984) (quoting The CONQUEROR, 166 U.S. at 133; see also Rederi A/B Soya v. Evergreen Marine Corp., 1972 AMC 1555, 1558 (E.D. Va. 1971), aff'd, 1972 AMC 538 (4th Cir. 1972).

In this case, the district court did not err in allowing as an element of damages lost catch. We turn now to the question of whether the record shows that the district court's award of damages for lost catch satisfied the standard of "reasonable certainty."

(ii)

Scully maintains that, assuming arguendo, the claim for lost catch is one on which relief can be granted, the damages have not, as a matter of law, been proven with reasonable certainty. Scully further main-

11

tains that while such detention damages[5] are normally measured by taking a fair average of a vessel's earnings over a number of voyages before and after the collision, see, e.g., Delta S.S. Lines, Inc., 747 F.2d at 1001 & n.12; see also The CONQUEROR, 166 U.S. at 126; The Esso Camden, 244 F.2d at 201, in this case, the district court's ultimate award bore an insufficient relationship to the four voyages offered in evidence by Yarmouth.

Yarmouth presented evidence of four LADY OLIVE MARIE fishing trips during 1994, two ending prior to the collision and two after:

| | |
|---|---|
| July 23, 1994 | C$44,503.05 |
| August 20, 1994 | C$65,423.50 |
| September 24, 1994 | C$75,492.45 |
| October 22, 1994 | C$52,857.50 |
| | _____ |
| TOTAL | C$238,276.50 |
| AVERAGE | C$ 59,569.13 |

J.A. at 336-39, 344. Notwithstanding this evidence, the district court concluded that the "actual catch and the actual revenues of the 55' ENDURANCE is the best evidence of how much the 65' LADY OLIVE MARIE would have caught on this voyage but for the casualty. The ENDURANCE fished the same fishing hole during part of the same time LADY OLIVE MARIE would have fished but for the casualty." J.A. at 49. Yet, as Scully points out, the record contains undisputed evidence in the form of testimony by Captain Belliveau that although the LADY OLIVE MARIE often fished along with the ENDURANCE, the two boats' catches varied and there was a "good chance that [one would catch] more than the other." J.A. at 99. Moreover, in making its award, the district court does not appear to have given any consideration to the four voyages of the LADY OLIVE

_____

[5] Damages for lost profits arising from the loss of use of a vessel for repairs after a collision or other maritime tort "has traditionally been called detention." Bolivar County Gravel Co. Inc. v. Thomas Marine Co., 585 F.2d 1306, 1308 n.2 (5th Cir. 1978).

12

MARIE offered in evidence. Rather, the court simply awarded Yarmouth damages in the amount of C$85,182.10, which equaled the boat price of the fish sold by the ENDURANCE at the conclusion of its August 1994 voyage. This figure, however, represents some C$25,000 more than the average earnings of the LADY OLIVE MARIE and C$10,000 more than that vessel's best catch of the year. See supra n.11.

In the face of these indisputable facts, and because the record is bereft of any indication that the lower court engaged in any detailed analysis to determine lost profits based on all available information, it is impossible for us to determine whether the district court's award of detention damages satisfies the "reasonable certainty" standard. In this regard, the two cases on which Yarmouth relies as evidence that the district court properly calculated damages are illustrative. In The PAGE, 18 F.Cas. 977 (D. Cal. 1878), fishermen on a lay share sought damages for lost catch due to the premature termination of a voyage. The vessel's master failed to provide them with sufficient salt to cure the fish. The trial court allowed the fishermen to recover lost profits for a period of 25 days by computing their average per diem catch for the 25 days preceding the actual termination of the voyage, and allowed them to recover for a similar catch for the succeeding 25 days. Id. at 979.

More recently, in Miller Industries, in which fishermen on a lay sought recovery for lost profits because of the interruption of a voyage due to the mechanical malfunction of the vessel, the PRISCILLA ANN, the Eleventh Circuit upheld the district court's award of damages where the catches of three other vessels fishing in the same area were used as a measure and where the "appropriateness of the other vessels' catches for comparison was demonstrated by the PRIS-CILLA ANN's comparable average daily catches during the period all four vessels were fishing." The court went on to state that "[b]ased on this evidence, we agree with the district court that the plaintiffs met their burden of proving their lost catch to a `reasonable certainty.'" 733 F.2d at 822 (emphasis added).

In the case at bar, by way of contrast, the LADY OLIVE MARIE had caught no fish at the time of the collision. The district court, therefore, could not avail itself of such a relatively reliable indicator

13

to guide its award of damages for lost catch as The PAGE and Miller Industries courts had done. Nevertheless, the court's seeming whole-sale reliance on the catch of a similarly situated vessel, the ENDURANCE, without so much as a reference to the evidence of four other of the LADY OLIVE MARIE's 1994 voyages, suggests a lack of reasonable certainty in this portion of the damage award. Without a reasoned explanation for the decision to use the one voyage of the ENDURANCE as an appropriate measure of damage for lost catch under the circumstances of this case, we are unable to conclude that the award of damages is supported by a finding to a reasonable certainty. Accordingly, we shall vacate the judgment and remand this portion of the damage award to the district court for further consideration. We leave to the district court's exercise of discretion the precise contours of any additional hearing, evidentiary or non-evidentiary, which the court may or may not elect to hold. We do anticipate, however, that at a minimum the court will elaborate upon the evidence of record, and state with particularity its findings in regard to the damages for lost catch ultimately determined to be established with "reasonable certainty."

(iii)

Scully next contends that the district court erred in awarding the captain and crew of the LADY OLIVE MARIE damages for lost profit in light of the Supreme Court's decision in Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927). In Robins Dry Dock, the plaintiffs had chartered a ship that was negligently damaged while in dry dock. As a result of the damage to the ship and the ensuing delay, the plaintiffs suffered economic losses. Rather than sue the ship's owners for breach of contract, the plaintiffs sued the dry dock. Thus, Robins Dry Dock turned on the issue of "whether the [time charterers had] an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who [knew] nothing of the charter." Id. at 308.

Justice Holmes, writing for the Court, held that "a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong . . . . The law does not spread its protection so far." Id. at 309 (citation omitted). The Court further

14

held that the vessel owners could not recover damages for loss of use as trustees for the time charterers. To that end, the court stated that "the [time charterers] have no claim either in contract or tort, and they cannot get a standing by the suggestion that if some one else had recovered it he would have been bound to pay over a part by reason of his personal relations with the [time charterers]." Id.

Scully contends that the legal status of the LADY OLIVE MARIE's captain and crew is no different from that of the time charterers in Robins Dry Dock. Therefore, he argues, they are not entitled to recover for the loss of use of the vessel resulting from the collision. As support for this conclusion, Scully cites, inter alia, Boat Dianne Lynn, Inc. v. C & N Fishing Corp., 729 F. Supp. 1400 (D. Me. 1989) (holding that fishermen aboard vessel damaged in collision, who had no ownership interest in vessel, and who were paid percentage of wholesale proceeds of catch, could not recover lost earnings when boat was negligently damaged in collision); Casado v. Schooner Pilgrim, Inc., 171 F. Supp. 78 (D. Mass. 1959) (same); Cusumano v. The Curlew, 105 F. Supp. 428 (D. Mass. 1952) (same). Scully also cites Henderson v. Arundel Corp., 262 F. Supp. 152 (D. Md. 1966), aff'd, 384 F.2d 998 (4th Cir. 1967), for this conclusion. Henderson, however, is distinguishable from the case at bar.

In Henderson, several crew members of a dredge, which was severely damaged in a collision with another vessel, sued the dredge owner and the owner of the other vessel for lost wages while the necessary repairs were made to the dredge. Id. at 153. The owner of the other vessel claimed, in his defense, that he was not liable to the dredge workers based on the Robins Dry Dock principle. Id. at 159. Conversely, the dredge workers claimed that their recovery should be allowed, in any event, based on a special rule applicable to fishermen -- and by logical extension to seamen generally-- "`which made the [tortious] wrongdoer liable not only for the damage done to the fishing vessel, but liable for the losses of the fishermen as well.'" Id. (quoting Carbone v. Ursich, 209 F.2d 178, 182 (9th Cir. 1953)). The Henderson court, however, found the dredge workers' recovery to be precluded by Robins Dry Dock and its progeny. Id. at 160. The court also criticized those cases that purported to create a so-called "fishermen's exception" to the Robins Dry Dock principle. Id. at 159-60. This Court affirmed the judgment without opinion.

15

Yet, dredge workers are not fishermen, as are the crew members of the LADY OLIVE MARIE in the case sub judice . Furthermore, dredge workers do not, as Yarmouth correctly argues, invest in a voyage as do fishermen on a lay, nor are they typically paid a percentage of the profits. Rather, they are compensated on the basis of a fixed wage scale. Thus, we are persuaded that Henderson is distinguishable from and not controlling in the instant case.[6] Accordingly, we regard the issue of whether fishermen on lay shares can recover lost profit from a fishing voyage prematurely ended by the tortious conduct of a third party as an open issue in this circuit.

Without question, the Robins Dry Dock principle is alive and well in the Fourth Circuit. See, e.g., Venore Transp. Co. v. M/V Struma, 583 F.2d 708, 710-11 (4th Cir. 1978); Rederi A/B Soya, 1972 AMC at 1563-66. Moreover, the district court in the case at bar stated that "if Robins was applied to this case, the economic losses of the fishermen caused by the defendant's negligence would not be recoverable." J.A. at 53 n.1. Such harshness of result was what led the Ninth and Eleventh Circuits to create "exceptions" which permitted crew members of fishing vessels to recover for their share of lost catch when the vessel was negligently damaged. See Carbone, 209 F.2d at 181-82; Miller Industries, 733 F.2d at 818-20. With respect to Robins Dry Dock, the Carbone court stated that the Supreme Court, "although dealing with a well established rule of law of torts, was not thinking of the special situation of fishermen . . . . [S]eamen are the favorites of admiralty and their economic interests [are] entitled to the fullest possible legal protection." Id. at 182.

The situation of the fishermen in the instant case differs not only from that of dredge workers, but also from that of the time charterers in Robins Dry Dock. Unlike the purely contractual relationship between the time charterers and the vessel owners in Robins Dry Dock, Yarmouth and the crew of the LADY OLIVE MARIE were engaged in a kind of joint venture. Both parties were entitled to a percentage of revenues from the voyage -- revenues that for fishermen

_____

[6] The lower court characterized the Henderson court's holding with regard to commercial fishermen as "dicta." J.A. at 53. See also Pruitt v. Allied Chemical Corp., 523 F. Supp. 975, 981 n.31 (E. D. Va. 1981) (same).

16

constituted their very livelihood, a critical fact recognized by both the Carbone and Miller Industries courts. The Miller Industries court also noted that

> where the fishermen's wages are dependent on the vessel's catch and that vessel is tortiously incapacitated, their losses are as foreseeable and direct a consequence of the tortfeasor's actions as the shipowner's loss of use. Hence, they are unlike the time charterer in Robins Drydock[sic] whose contract with the shipowner is impaired "unknown to the doer of the wrong[.]"

733 F.2d at 820. Cf. Venore Transp. Co., 583 F.2d at 710 ("The principle of Robins Dry Dock is perfectly defensible, if pragmatic considerations require the foreclosure of remote damage claims . . . . There is nothing remote about these damages; the only objection is that they were suffered by the time charterer rather than the owner.").

Upon our mature examination of the issue, we embrace the "pragmatic considerations" identified by former Chief Judge Haynsworth in Venore Transp. Co. and agree with the reasoning of our sister circuits, that the principle of Robins Dry Dock is no bar to recovery by the fishermen here. Analogously, this Court has recognized the special status of commercial fishermen adversely affected by the tortious pollution of waterways, see Adams v. Star Enterprise, 51 F.3d 417, 424-25 (4th Cir. 1995) (citing Pruitt, 523 F. Supp. 975). We are persuaded that fishermen on a lay and bound to the vessel, as in the instant case, with their livelihoods at stake, should be allowed to recover for the tortious acts of third persons causing the premature cessation of the undertaking, provided their losses, like any plaintiff's losses, are proved to a "reasonable certainty."

(iv)

As his final contention, Scully claims that the district court erred in awarding damages (and pre-judgment interest) for the cost of repairs never made because the LADY OLIVE MARIE was lost at sea approximately two months after the collision. As Yarmouth notes, however, vessel repairs are not a "prerequisite to an award for physical damages caused by a collision." Appellee's Brief at 24. Accord-

17

ingly, "[d]amages in collision cases, where repairs are not made, can be measured either by the estimated cost of repairs at a time immediately following the accident . . . or by the market value of the vessel." United States v. Shipowners & Merchants Tugboat , 103 F. Supp. 152, 153 (N. D. Cal. 1952), aff'd, 205 F.2d 352 (9th Cir.), cert. denied, 346 U.S. 829 (1953); see also Bunge Corp. v. American Commercial Barge Line Co., 630 F.2d 1236, 1241 (7th Cir. 1980); Kansas City Southern Railway Co. v. Barge HBC 8106, 642 F. Supp. 609, 612 (W. D. La. 1986). In the case at bar, the physical damages were proven based on the estimated cost of repairs.[7]

The district court also awarded pre-judgment interest on the estimated cost of repairs to the LADY OLIVE MARIE. The court clearly was vested with the authority to do so as the Supreme Court observed in City of Milwaukee v. Cement Division, National Gypsum Co., ___ U.S. ___, 115 S.Ct. 2091 (1995), when it stated that

> prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for "peculiar" or "exceptional" circumstances ... whether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury.

Id. at 2096 (emphasis added). See also Reeled Tubing Inc. v. M/V CHAD G, 794 F.2d 1026, 1028 (5th Cir. 1986).

IV

For the reasons set forth above, we affirm the judgment insofar as liability is imposed 100% upon appellant. We vacate and remand for

_____

[7] The district court expressed the view that once the evidence established that the damage to the vessel had been done, Yarmouth was entitled to recover for that damage. The court further found that the fact that the repairs to the vessel had not been made, or that the value of the vessel was paid by Yarmouth's insurer, was of no moment. J.A. at 127, 322-23. We agree with the district court that the burden was on Scully to establish, if he could, that an award of the entire cost of repair constituted a double recovery. See J.A. at 127.

18

further proceedings consistent with this opinion on the issue of damages.

<u>AFFIRMED IN PART, VACATED AND REMANDED</u>
<u>IN PART FOR FURTHER PROCEEDINGS CONSISTENT</u>
<u>WITH THIS OPINION</u>

19